**UNITED STATES, Appellee,**

v.

**Herman A. BACA, Specialist Four, U.S. Army, Appellant.**

No. 53,859.
CM 445775.

U.S. Court of Military Appeals.

Sept. 30, 1988.

For Appellant: *Captain Scott A. Hancock* (argued); *Lieutenant Colonel Arthur L. Hunt, Major Eric T. Franzen, Captain Pamela G. Montgomery* (on brief); *Colonel John T. Edwards, Colonel Brooks B. LaGrua, Lieutenant Colonel Paul J. Luedtke, Captain Keith W. Sickendick* and *Captain Craig E. Teller.*

For Appellee: *Captain Jody M. Prescott* (argued); *Colonel Norman G. Cooper, Lieutenant Colonel Gary F. Roberson, Lieutenant Colonel Larry D. Williams, Captain Tarek Sawi* (on brief); *Colonel James Kucera* and *Lieutenant Colonel Adrian J. Gravelle.*

*Opinion of the Court*

EVERETT, Chief Judge:

Convicted by general court-martial members of drunken driving and involuntary manslaughter,[1] appellant contends (22 M.J. 239) before this Court that he was denied his Sixth-Amendment[2] right to counsel.[3] Without reaching this claim, we conclude, instead, that the military judge erred in severing appellant's established attorney-client relationship with his detailed defense counsel without good cause. *See* Art. 38(b), Uniform Code of Military Justice, 10 U.S.C. § 838(b); *accord* R.C.M. 505(d)(2)(B)(ii), Manual for Courts-Martial, United States, 1984.

I

During the several months between the automobile accident which gave rise to the charged offenses and the beginning of this trial, Captain Stephen Deardorff had represented Baca. In that capacity, Deardorff conducted several interviews of his client and had been Baca's counsel during the investigation of the charges pursuant to Article 32, UCMJ, 10 U.S.C. § 832. Accordingly, an attorney-client relationship between the two was long-established.

At a pretrial hearing under Article 39(a) of the Uniform Code, 10 U.S.C. § 839(a), Baca moved to have his trial continued. Captain Stephanie Spahn, who had been appointed as assistant defense counsel 3 days earlier, explained that Baca appeared to be suffering from amnesia and that the continuance was requested in order "to allow Specialist Baca to be examined by a neurologist so that a more definitive deter-

---

1. *See* Arts. 111 and 119, Uniform Code of Military Justice, 10 U.S.C. §§ 911 and 919, respectively. As to the latter offense, appellant had been charged originally with unpremeditated murder; he pleaded guilty to negligent homicide but was found guilty of involuntary manslaughter. The members sentenced Baca to a bad-conduct discharge, confinement for 1 year, forfeiture of $90 pay per month for 12 months, and reduction to the lowest enlisted grade. After the convening authority approved these results, the Court of Military Review set aside the drunk-driving conviction but otherwise affirmed.

2. U.S. Const., amend. VI.

3. Additionally, we granted review of the following issues:

II
WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF THE ACCUSED IN REFUSING TO GRANT A DEFENSE REQUEST FOR A CONTINUANCE IN ORDER TO EVALUATE APPELLANT'S AMNESIA AND ALLOW FOR THE RECOVERY OF HIS MEMORY.

III
WHETHER THE MILITARY JUDGE ERRED IN REFUSING TO RECUSE HIMSELF UPON A DEFENSE CHALLENGE FOR CAUSE.

In light of our disposition of the claimed denial of defense counsel, we need not resolve these other matters.

mination can be made as to whether or not he is suffering from retrograde amnesia." When the military judge asked why that was important one way or the other, Spahn responded that "the defense asserts that retrograde amnesia on the part of Specialist Baca would prohibit him from effectively assisting in his own defense, would make him incompetent to stand trial."

The military judge clearly was skeptical. He suggested that if society were willing "to abate proceedings" simply "because an accused said he didn't remember what happened, there wouldn't be any trials." Spahn answered that it was the purpose of the defense to learn whether there was a neurological or physiological basis for the apparent amnesia—and that, "if there is such a basis that would make the accused incompetent to stand trial because he cannot participate in his own defense if he doesn't remember what happened that evening."

Lengthy discussion on the issue followed, with both defense counsel arguing that a physiological basis for amnesia would form an appropriate basis for a continuance; with the military judge openly doubting the legal basis for such a position; and with trial counsel urging that, anyway, the prosecution could present "evidence to show that the amnesia, the alleged amnesia, is feigned."

At one point during this exchange, the military judge asked what evidence the defense intended to present to demonstrate Baca's amnesia. Among other witnesses, Deardorff indicated that he, himself, would testify as to his "observations" of Baca and the difficulty Baca had had in remembering even their own discussions from one moment to the next.

Ultimately, the military judge denied the motion to continue the proceedings and to order a neurological examination of Baca.

At that point, the military judge shifted gears somewhat and queried defense counsel: "Let's talk about your testifying. Given the state of the law [that amnesia is not an appropriate legal basis to abate proceedings], what is the purpose of your testifying?" He explained, "My concern here is that we are raising a potential for severing an attorney-client relationship that need not be raised because this is not a hot issue." The defense responded that the legal effect of an accused's amnesia was, indeed, a viable issue that the defense was willing and prepared to argue. When the military judge said that this was not then the issue—that, instead, "the issue here is ... whether you want to testify"—Deardorff explained that, if the judge were to rule that amnesia is not relevant to the issue of competence, "then at that point I will not testify." Otherwise, he would need to do so.

At this point, the military judge tried to clarify the state of the proceedings:

MJ: Where we are is this. You have given notice of your intention to litigate competence to stand trial.

DC: Yes, sir.

MJ: Okay, I haven't decided that issue.

DC: Yes, sir.

MJ: You requested a continuance to round up some evidence which we agree will establish no more than amnesia resulting from a blow to the head if the doctor says what you want him to.

DC: That's correct, Your Honor.

MJ: Well, there is no reason to do that. There is no good cause for that kind of continuance. If you can get to your doctor in the time we have available that's fine, but I am not going to order the doctor to do a neurological examination. Now we have a sanity board [report] and we have a virtual non-issue. Now, I'm willing to be convinced, but thus far there is no reasonable doubt in my mind and I'm making decisions about other matters, and the question now is whether to cause you, the accused, and the judicial system the turmoil of testifying about something that isn't necessarily worth the effort. Now, if you think it's worth the effort, fine, we'll go through the turmoil, but I want you to understand the consequences which may in-

clude severance of an attorney/client relationship.

In an obvious effort to remove himself from the horns of the dilemma posed by the military judge, Deardorff asked the military judge to assume for the moment that the defense could establish that Baca had amnesia and that it was caused by a blow to the head during the accident. He also asked the judge to keep in mind the difficulty this amnesia presented for counsel in preparing a defense or in advising Baca whether a plea bargain was appropriate. On these premises and nothing more, Deardorff inquired whether the military judge would rule, nonetheless, that Baca was competent to stand trial. He explained that, if so, then this would resolve the matter, for then there would be no need for him to testify. The military judge declined to offer such a ruling and opined that to do so would open himself up to a claim that he had thereby "somehow deprived the accused of presenting relevant evidence on the subject."

After a short recess, all parties returned to the courtroom. Thereupon, Deardorff offered this proposal: He would remove himself as defense counsel for purposes of the competence hearing, and Spahn would litigate that issue on behalf of Baca. He would testify at that hearing as a witness, and Baca would agree to waive the attorney-client privilege for that purpose, so that counsel could be freely cross-examined as a witness by trial counsel. Then, if the military judge ruled adversely to the defense on that motion, he would reassume his role as defense counsel for the trial on the merits before the court members—who, of course, would have no idea that he had performed in any other role in the case.

After trial counsel continued to resist permitting Deardorff to perform in both capacities, the following colloquy ensued:

MJ: Well, there is still that possibility that the interests of justice require, I don't know, and I'm not going to make a hypothetical decision on the interests of justice requiring something about letting him continue to participate in the case. I am not inclined to the view that it is necessary, appropriate, or wise to allow that to happen. The positions of witness and counsel are philosophically inconsistent. We say that a lawyer who has himself for a client has a fool for a client. There is an analogy in there to a lawyer's observation about his accused and vouching for his credibility which is essentially what we are talking about here, expressing personal opinions at one stage about the credibility of a witness and somehow divorcing himself or herself, in this case, himself from similar vouching for the credibility of a witness later on. If counsel can't say in argument I believe my client but he has already said that at a 39(a) session, aside from it being a traumatic experience, there is a philosophical inconsistency there. There is no dearth of defense counsel in this jurisdiction, qualified counsel.... There just doesn't seem to be a compelling interest in violating the general rule that in a case a defense counsel will not or trial counsel will not be a witness. I'm willing to be convinced but—

DC: The only distinguishing fact in this case, that I see, from the defense standpoint is that the facts that I would be testifying about and the issues would not be issues that would be raised on the merits or sentencing.

\* \* \* \* \* \*

MJ: ... I'm not going to decide that issue. I'm going to hold the parties to the consequences of what they do. It may be necessary to decide the issue. It may not be necessary. Until it's necessary I'm not going to decide it, but I want everybody to know what they are facing here, so that any later claims of prejudice are the product of decisions that were intelligently, knowingly and consciously made.

Ultimately, the defense proceeded as it had indicated it would: Spahn conducted the litigation of the competence motion, and one of the witnesses she called was Deardorff. Before doing so, however, the

defense once again sought to reconcile the dilemma by tendering an offer of proof in the form of a lengthy affidavit by Deardorff. Therein, he set out the reasons for concluding that he must offer the included evidence and all the facts in his relationship with Baca which led him to believe that Baca's amnesia was legitimate and which caused him substantial difficulty in representing Baca. Although the military judge accepted the affidavit as an appellate exhibit, he declined to treat it as evidence in lieu of testimony. Accordingly, as has been mentioned, Deardorff took the stand.

Deardorff testified that Baca consistently had stated that he could not remember the critical events of the evening in question. Specifically, he could recall having "four or five beers or so" at the enlisted club and, thereafter, taking a friend home; however, after leaving his friend's house, he had become "lost or misoriented and that was basically the last thing he remembered until he was in the hospital." Deardorff revealed, further, that Baca had demonstrated problems remembering things that Deardorff had explained to him and that, consequently, preparation for trial had been extremely difficult. Finally, Deardorff testified that he believed Baca's story. Ultimately, the motion was denied.

As might have been predicted, the military judge issued the following ruling as a result of Deardorff's testifying:

> Captain Deardorff is relieved as Defense Counsel. The general rule that a lawyer may not be counsel and witness is based, in part, upon the common sense reality that a lawyer who does that has crossed the great divide which separates counsel from observer. An examination of the affidavit, Appellate Exhibit X, reveals or verifies the suspicion that Captain Deardorff, a conscientious and able counsel, is in this case too emotionally involved to be an effective advocate, and accordingly the public policy in support of the rule is met in fact in this case.

Later, the military judge saw the need to expand this ruling somewhat, and explained his reasons for doing so:

At docket call Captain Deardorff indicated that my docketing of another case inconvenienced him because he wished to be present during the Baca case to assist Captain Spahn. I informed him at that time that he would not be permitted to attend open sessions of this trial. Captain Deardorff still considers himself personally responsible for Specialist Baca; he is Captain Spahn's supervisor. During the last session I found him incapable of rendering effective assistance of counsel because of his lack of detachment and disqualified him not only for that fact but for the visible symptom of that fact, his testimony at the Article 39(a) session. Captain Deardorff will not be permitted to continue as defense counsel either personally or by remote control, operating as puppeteer from the visitor section, communicating with Captain Spahn by means of sign, gesture or grimace. This court did not preclude consultation between Captain Spahn and Captain Deardorff because Captain Deardorff was more likely to be familiar with the facts of the case and Captain Spahn's only involvement to that point was in motion practice. She was not at the Article 32 and may not have been completely well versed in the facts of the case .... I do not now conclude that it is necessary to bar Captain Spahn from discussing this case with her supervisor. But if it appears that the senior defense counsel, who is factually incapable of rendering effective assistance of counsel, is still running the defense of Specialist Baca, it may be necessary in Specialist Baca's interest and the interest of justice to consider a protective order.

Shortly before, Spahn unsuccessfully objected to Deardorff's exclusion on the grounds of denial of public trial and unsuccessfully, as well, moved for "a continuance ... in order to file a writ of prohibition concerning severance" of Deardorff. From that point on, trial proceeded with Spahn representing Baca and with Deardorff excluded from the courtroom.

## II

It is somewhat unclear what was the basis for the military judge's severance of the attorney-client relationship between Deardorff and Baca. Until the point at which he actually disqualified Deardorff, all indications were that the judge's concern was the philosophical inconsistency between the same person being defense counsel and a witness. However, the last two passages quoted above suggest, instead, that the judge may have acted out of concern for Baca—that is, that Deardorff was too personally and emotionally involved in the case to represent his client effectively.

### A

■ If the presumed emotional involvement was the basis for his ruling, the military judge clearly erred. Indeed, government appellate counsel do not even urge this theory in this Court. In disqualifying Deardorff, the military judge pointed to Deardorff's affidavit admitted as an offer of proof on the competence motion as an indication of counsel's over-involvement, but our examination of that exhibit leaves no such impression.[4]

The affidavit—which extended to 5½ single-spaced, legal-size pages—in some detail explained Deardorff's frustration in attempting to represent an unremembering criminal accused and his general "burn-out," as well, from 4½ years of steady criminal defense practice. However, there is no suggestion anywhere in this affidavit that Deardorff had so identified with his client that he would be unable to maintain perspective in the case and no suggestion, either, that his self-assessed "burn-out" had caused or would cause him not to represent Baca adequately. Indeed, the record of trial up to the point when the military judge disqualified Deardorff portrays counsel as dedicated, thorough, aggressive, and fully competent. Under these circumstances, severing the existing

attorney-client relationship over the objection of the accused was error.

We would have had no need to resolve this issue if the military judge here had followed the course that this same judge later took in *United States v. Hanson*, 24 M.J. 377 (C.M.A.1987). There, the judge concluded that detailed defense counsel was rendering Hanson ineffective representation by not fully exploring with his client a potential defense of entrapment before deciding to plead guilty. Accordingly, he removed the lawyer as detailed defense counsel but made abundantly clear that he was not severing the attorney-client relationship and was not depriving Hanson of counsel's service. At a later session, a new lawyer appeared as detailed defense counsel, and the former detailed counsel appeared as his assistant and actively participated in the court-martial.

We decided that, under these circumstances, the established attorney-client relationship had not been severed; instead, the former detailed defense counsel remained actively associated with the defense. Additionally, we held that the judge's acts of "assignment of additional counsel and his demotion of" the original counsel were authorized and did not directly or indirectly impair Hanson's defense. *Id.* at 379.

In this connection, we recognized that "[a] military judge has considerable responsibility for the proper administration of military justice" and, thus, "has a responsibility to raise 'on his ... own initiative, at all appropriate times and in an appropriate manner,' any matter which may promote justice at the trial." *Id.*, quoting from ABA Standards, *Special Functions of the Trial Judge*, Standard 6–1.1(a) (1982). Unfortunately here, the military judge's disqualification of Deardorff and his ban of Deardorff from the courtroom—rather than "promot[ing] justice at the trial"—deprived Baca of a most cherished right to

---

4. Excessive involvement with a client may raise some later issues as to effective assistance of counsel, but nothing in this case resembles the fact situation, for instance, in *United States v. Babbitt*, 26 M.J. 157 (C.M.A.1988).

the continued representation of his lawyer of 5 months.

### B

■ If, as is more likely, the military judge disqualified Deardorff simply because he testified as a defense witness on the competence motion, he was equally in error under the circumstances of this case. Both the military judge and government counsel in this Court generally rely on the maxim that an advocate should not, in the same cause, appear as a witness, and the Government relies heavily on Disciplinary Rule 5–102 of the American Bar Association's Model Code of Professional Responsibility (1980).[5] We conclude, however, that a sensible and sensitive reading of this rule—and the Canon which it implemented and the Ethical Considerations which discussed it—would not have supported Deardorff's disqualification.

Canon 5 of the Model Code admonished, "A lawyer should exercise independent professional judgment on behalf of a client." To this end, DR 5–102 instructed:

> Withdrawal as Counsel When the Lawyer Becomes a Witness.
>
> (A) If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial and his firm, if any, shall not continue representation in the trial, except that he may continue the representation and he or a lawyer in his firm may testify in the circumstances enumerated in DR 5–101(B) (1) through (4).

5. In August 1983, the American Bar Association's House of Delegates adopted the Model Rules of Professional Conduct as official ABA policy, replacing the Model Code of Professional Responsibility which had been adopted by the House of Delegates on August 12, 1969, and had been amended by the House of Delegates in 1970, 1974, 1975, 1976, 1977, 1978, 1979, and 1980. However, the Model Code has been widely invoked as authoritative guidance on ethical matters, so we will discuss its pertinent portions, followed by a discussion of the official

The referenced exceptions listed in DR 5–101(B), in which a lawyer may continue to represent his client even while testifying in his behalf as a witness, were as follows:

> (1) If the testimony will relate solely to an uncontested matter.
>
> (2) If the testimony will relate solely to a matter of formality and there is no reason to believe that substantial evidence will be offered in opposition to the testimony.
>
> (3) If the testimony will relate solely to the nature and value of legal services rendered in the case by the lawyer or his firm to the client.
>
> (4) As to any matter, if refusal would work a substantial hardship on the client because of the distinctive value of the lawyer or his firm as counsel in the particular case.

The first two possibilities, of course, would not have applied: Trial counsel made clear that the prosecution intended to contest the legitimacy of Baca's amnesia; moreover, Baca's competence to stand trial certainly was not simply "a matter of formality," and it was clear that "substantial evidence ... [would] be offered in opposition to" his testimony by the Government.

The bulk of Deardorff's testimony, though, might well have fallen within the third exception. Baca's lack of memory of the incident in his discussions with Deardorff, his lack of retention of Deardorff's legal advice and instructions for more than a short time, and Deardorff's resulting difficulty in representing his client adequately all directly relate to "the nature and value of legal services rendered in the case by the lawyer ... to the client." [6]

Model Rules in the context of the facts of this case.

6. This language *might* be read as focusing on the subject of the lawyer's fee; but it is not *necessarily* so limited. *See generally* Rule 3–7, Rules of Professional Conduct for Lawyers, Department of the Army Pamphlet 27–26 (Dec. 31, 1987) (where, in adopting the substance of the ABA rules essentially verbatim, this particular exception was reworded to include a situation in which "the testimony relates to the nature

Also, it seems that the fourth exception would have applied. The military judge himself acknowledged that Spahn's involvement in the defense had only been recent (3 days) and limited (motion practice only—indeed, it had extended merely to litigation of the motions relating to this issue). As the military judge recognized:

> This court did not preclude consultation between Captain Spahn and Captain Deardorff because Captain Deardorff was more likely to be familiar with the facts of the case and Captain Spahn's only involvement to that point was in motion practice. She was not at the Article 32 and may not have been completely well versed in the facts of the case.

Under these circumstances, it might well be apparent to some that removing Deardorff's services as defense counsel "would work a substantial hardship on the client because of the distinctive value of the lawyer ... as counsel in the particular case." *See* ABA Formal Opinion 339 (Jan. 31, 1975), ABA Committee on Ethics and Professional Responsibility. *But cf. MacArthur v. Bank of New York*, 524 F.Supp. 1205, 1210 (S.D.N.Y.1981) ("substantial hardship" does not arise merely from "counsel's familiarity with the" case).

Apart from whether the facts of this case neatly would have fit the exceptions to the general rule of DR 5–102, it is clear to us that the concerns leading to Canon 5, which that rule had sought to implement, are not involved here. The thrust of Canon 5, quite simply, was that a lawyer's efforts on his client's behalf should be exercised independently and without compromise to that end. Thus, Ethical Consideration 5–1 charged, generally:

> The professional judgment of a lawyer should be exercised, within the bounds of the law, solely for the benefit of his client and free of compromising influences and loyalties. Neither his personal interests, the interests of other clients, nor the desires of third persons should be permitted to dilute his loyalty to his client.

and *quality* of legal services rendered in the

More specifically focusing on the situation presented in this case, Ethical Considerations 5–9 and 5–10 both admonished that, generally, a lawyer should avoid positions in which he will be both a witness and an advocate. EC 5–9 pointed out some of the problems usually inherent in such a dilemma:

> If a lawyer is both counsel and witness, he becomes more easily impeachable for interest and thus may be a less effective witness. Conversely, the opposing counsel may be handicapped in challenging the credibility of the lawyer when the lawyer also appears as an advocate in the case. An advocate who becomes a witness is in the unseemly and ineffective position of arguing his own credibility....

EC 5–10, in part, addressed the rare situation in which a lawyer appropriately can and must perform both roles:

> In the exceptional situation where it will be manifestly unfair to the client for the lawyer to refuse employment or to withdraw when he will likely be a witness on a contested issue, he may serve as advocate even though he may be a witness. In making such decision, he should determine the personal or financial sacrifice of the client that may result from his refusal of employment or withdrawal therefrom, the materiality of his testimony, and the effectiveness of his representation in view of his personal involvement. In weighing these factors, it should be clear that refusal or withdrawal will impose an unreasonable hardship upon the client before the lawyer accepts or continues the employment....

■ Considering these concerns and principles in light of the facts of this case, it is clear that they would not have compelled Deardorff to leave the defense. No one but Deardorff was in a position to offer the testimony which he gave—only he had the insight into the difficulty which his client had with remembering counsel's instructions and advice, and he, uniquely,

case" (emphasis added)).

could detail the practical inability of representing Baca when Baca was unable to participate in his defense. Accordingly, any possibility that Deardorff, in this posture, would have been impeachable for interest and, accordingly, would have been "a less effective witness" is of no moment: He was the *only* witness.[7]

■ At the same time, all other concerns set out in EC 5–9 were met by the defense proposal for proceeding: Baca waived his attorney-client privilege for purposes of trial counsel's cross-examination of Deardorff, so such examination was free and unfettered. Moreover, Deardorff's withdrawal as counsel for the limited purpose of litigation of the motion and Spahn's acting as counsel for that purpose removed any handicap which otherwise trial counsel might have had in arguing against the credibility of an opposing counsel, and Deardorff was thus removed from "the unseemly and ineffective position of arguing his own credibility." Finally, because the proceeding in which Deardorff acted as a witness and not as an advocate was clearly distinct from the remainder of the trial and was out of the members' presence, the members would have seen him only as an advocate, never as a witness.[8] Thus, neither the defense nor the prosecution would have been either advantaged or disadvantaged by the proposed arrangement.

At the same time, as EC 5–10 warned, Deardorff quite clearly had considered the disadvantage to his client if he withdrew as counsel, in light of his extensive involvement over many months as compared to Spahn's relatively slight involvement over 3 days. Further, both his oral advocacy on the matter and his affidavit make clear

that he had seriously considered the materiality and uniqueness of his testimony on the competence issue and had sought to preserve his later effectiveness as an advocate by the proposal for bifurcated representation.

The ABA Model Rules of Professional Conduct and their Comment, *see* note 5, *supra*, are fully consistent with this discussion and analysis of the earlier Model Code. In relevant part, Rule 3.7, Lawyer as Witness, parallels DR 5–101(B)(1) and (2) and DR 5–102(A). The Practice Guide relating to Rule 3.7 in the ABA/BNA Lawyers' Manual on Professional Conduct sets out all the same concerns, discussed earlier, surrounding an advocate's appearance as a witness—concerns such as his impeachability being a detriment to his client, prejudice to the opposing party by inhibiting cross-examination of the lawyer-witness and by giving added weight to that testimony in jurors' minds, and maintaining the integrity of the advocate's role in an adversarial process. *See* 61:503–506, Trial Conduct. Of course, our resolution of those concerns under the facts of this case is equally as applicable to these rules as it is to the Model Code.

■ The right to effective assistance of counsel and to the continuation of an established attorney-client relationship is fundamental in the military justice system. *United States v. Palenius*, 2 M.J. 86 (C.M.A.1977). An existing attorney-client relationship cannot be terminated without the accused's consent merely for the convenience of the Government. *United States v Murray*, 20 U.S.C.M.A. 61, 42 C.M.R. 253 (1970). Instead, in the absence of an accused's consent or an application for with-

---

**7.** While Baca himself could have testified as to his lack of memory and inability to retain defense counsel's advice and instructions, only counsel was in a position to testify as to the impact that all this had on his preparation of the defense case.

**8.** Because the court members would never have seen Captain Deardorff as a witness—indeed, they never would have had occasion to even know he had been a witness—the military judge should not have had the concern which he earli-

er had expressed that Deardorff's testifying as a witness and continuing as counsel would have been akin to a lawyer personally vouching for his client in argument to the members. *See generally United States v. Fuentes*, 18 M.J. 41, 52 (C.M.A.1984) ("[I]t is impermissible and unprofessional for a lawyer in closing argument to express his personal belief or opinion in the truth or falsity of any testimony or evidence. *United States v. Knickerbocker*, 2 M.J. 128 (C.M.A.1977).").

drawal by the defense counsel, such a severance can only be for "good cause shown on the record." *United States v. Eason,* 21 U.S.C.M.A. 335, 45 C.M.R. 109 (1972). *Accord United States v. Hanson, supra; United States v. Gnibus,* 21 M.J. 1 (C.M.A. 1985); R.C.M. 505(d)(2)(b)(ii).

█ The foregoing analysis of the circumstances of this case and the ethical and practical considerations involved convince us that there was no "good cause" shown at all which would justify severing the existing attorney-client relationship between Deardorff and Baca. Indeed, it strikes us that both defense counsel and their client were imaginative and flexible in their efforts to meet all rational interests of the prosecution and of society and, yet, to permit Baca, as a criminal accused, to enjoy the continued services of his long-established attorney.

### III

As set out earlier, Deardorff had represented Baca for some 5 months prior to his removal by the military judge. As his affidavit vividly illustrates, these 5 months were very active months in an effort to prepare a defense, and they were months during which Deardorff came to establish a sincere professional concern for and sensitivity to his client's plight of nonremembrance.

On the other hand Spahn had represented Baca for only 3 days when the litigation giving rise to this appeal began. While the record reflects her as a competent and dedicated defense attorney, it is impossible to speculate whether she pursued Baca's interests in the same manner as Deardorff would have or arrived at the same end.

█ Defense counsel are not fungible items. Although an accused is not fully

and absolutely entitled to counsel of choice, he is absolutely entitled to retain an established relationship with counsel in the absence of demonstrated good cause. Accordingly, without any reflection on Spahn's performance, we are "not ... disposed to engage in nice calculations as to the existence of prejudice." *See United States v. Schreck,* 10 M.J. 226, 229 (C.M.A. 1981). *See also United States v. Evans,* 1 M.J. 206, 209 (C.M.A.1975) (where the accused did not receive representation from conflict-free counsel, "we are not persuaded that we should attempt 'nice calculations as to the amount of prejudice' that may have resulted to Evans. *Glasser v. United States,* 315 U.S. 60, 76, 62 S.Ct. 457, [467,] 86 L.Ed. 680 (1942).").[9]

### IV

The decision of the United States Army Court of Military Review as to Charge I and its specification is reversed. The findings of guilty thereon and the sentence are set aside. The record of trial is returned to the Judge Advocate General of the Army. A rehearing on Charge I and its specification may be ordered.

Judge SULLIVAN concurs.

COX, Judge (concurring):

I concur with the majority opinion. I write only to share some observations concerning Rule 3.7 of the American Bar Association Model Rules of Professional Conduct, which was adopted in February of 1984, virtually verbatim by the Judge Advocate General of the Army. Rule 3.7, "Rules of Professional Conduct for Lawyers," DA Pam. 27–26 (Dec. 1987). Army Rule 3.7 deals with the situation where counsel becomes a witness.

The rule is a good rule. More often than not, it protects the lawyer from becoming a

---

**9.** The record is replete with instances in which the military judge displayed a less-than-judicial attitude toward Captain Deardorff. For instance, in response to Deardorff's indication that he was considering filing a motion for dismissal due to overbreadth of the unpremeditated murder statute but that he needed to do more research to see if anyone had litigated such a motion before, the military judge stated:

"Oh, I'm sure that someone without much to do and a lot of imagination has thought of that before. I can see that we need more cases around here." Indeed, prior to Deardorff being excluded from the case, the defense had filed a motion to recuse the military judge on the ground, among others, that several comments by the military judge created the appearance of a hostile attitude toward defense counsel.

witness for or against the client. Counsel should be careful to avoid becoming a witness for the client and should be creative in developing other witnesses or finding other evidence to prove the points the lawyer wishes to make. For example, in this case, perhaps there were family members, friends, or acquaintances of the accused who could have established the amnesia problem and certainly there was a physician available who, at least, would have testified that the accused needed to see a neurologist.

However, the rule does not discuss directly the lawyer's role as a witness to collateral matters. Army Rule 3.7(a)(2) talks about testimony which "relates to the nature and quality of legal services rendered in the case." I doubt that this exception deals with the type of problem defense counsel had here.

Army Rule 3.7(a)(3), the "substantial hardship" exception, is really not helpful to the practitioner who has important information about the case but does not want to give up his position as the lawyer in the case.

The easiest way to deal with the problem is to try to determine where and how the testimony fits into the trial of the case. Is the lawyer interjecting himself into the controversy as a witness to the matters in dispute, or is his testimony aiding the court in the administration of the trial? Is the testimony relevant to his relationship with his client and his client's collateral rights, or does it go to the factual matters in litigation? If the testimony is focused upon the administration of the trial, as a general rule, there is no need to disqualify the lawyer. For example, if a speedy-trial motion is being litigated and the defense lawyer wants to put into the record that on a particular date, at a specific time, the defense demanded a trial, such testimony is extremely important to resolution of the speedy-trial motion, but it is collateral to the issue of whether the accused did the act of which he is accused. Most of these matters are normally stipulated to by opposing sides, but from time to time it becomes necessary for a lawyer to make a record about facts incident to his preparation for trial. Other types of collateral matters which have occasionally required a lawyer's testimony have been efforts to secure witnesses, identification of client's documents, jail conditions observed by the lawyer, requests for evidence, requests for polygraphs, and various other administrative matters related to the trial.

The issue here was whether the accused was competent to stand trial, which is a collateral issue to the question of whether the accused was driving under the influence of alcohol at the time and place alleged. This testimony was offered to the military judge outside the presence of the members and was necessary for the administration of the proceedings. In my judgment, a lawyer can testify about his client's inability to communicate with him without the necessity of being disqualified.

I suggest that as a general rule if the testimony is being offered to the judge to enable him to make a judicial ruling as opposed to being offered to the finders of fact as substantive evidence in the trial, the lawyer *normally* need not be disqualified. It is when the lawyer's own credibility must be put in issue as a witness before the finders of fact that we run afoul of the rule.

Because the testimony of the defense counsel in this case was directed at getting his client a medical examination and related to the accused's competence to stand trial, I agree with Chief Judge Everett that it was error for the military judge to disqualify counsel.