*This opinion is subject to revision before publication.*

# UNITED STATES COURT OF APPEALS
## FOR THE ARMED FORCES

————————

## UNITED STATES
Appellee

**v.**

## Eric S. GILMET, Chief Hospital Corpsman
United States Navy, Appellant

### No. 23-0010
Crim. App. No. 202200061

Argued April 18, 2023—Decided August 3, 2023

Military Judge: Hayes C. Larsen

For Appellant: *Lieutenant Commander Kristen R. Bradley*, JAGC, USN (argued); *Lieutenant Megan E. Horst,* JAGC, USN.

For Appellee: *Captain Tyler W. Blair*, USMC (argued); *Colonel Joseph M. Jennings*, USMC, *Lieutenant Gregory A. Rustico*, JAGC, USN, and *Brian K. Keller*, Esq.

Amici Curiae for Appellant: *Colonel Michael C. Friess*, USAR, *Colonel Jefferson E. McBride*, USAF, *Major David L. Bosner*, USAF, *Captain Samantha P. Golseth,* USAF, *Captain James C. Griffin*, USAR, and *Captain Justin L. Watkins*, USAR (on behalf of the United States Army Defense Appellate Division and the United States Air Force Defense Appellate Division).

Amicus Curiae for Appellant: *Philip D. Cave*, Esq., *Eugene R. Fidell*, Esq., *Brenner M. Fissell*, Esq., *Jason S. Grover*, Esq., and *Franklin D. Rosenblatt*, Esq. (on behalf of the National Institute for Military Justice).

Judge HARDY delivered the opinion of the Court, in which Chief Judge OHLSON, Judge MAGGS, Judge JOHNSON, and Senior Judge STUCKY joined.

————————

Judge HARDY delivered the opinion of the Court.

On November 18, 2021, Colonel (Col) Shaw, who oversaw the slating and assignment process for all Marine Corps judge advocates (JAGs), held a meeting with Camp Lejeune's Defense Services Office. Appellant's individual military counsel, Captain (Capt) Thomas, was in attendance. In response to a question from Capt Thomas, Col Shaw made statements that caused Capt Thomas to believe his military career would be in jeopardy if he continued to represent Appellant. As a result, both Capt Thomas and Appellant no longer believed that Capt Thomas could adequately represent Appellant due to a conflict of interest.

On December 10, 2021, Appellant filed a motion to dismiss the charges against him for unlawful command influence (UCI), alleging that Col Shaw's statements impermissibly interfered with his right to counsel. The military judge agreed and dismissed all charges and specifications with prejudice. The Government filed an interlocutory appeal under Article 62, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 862 (2018). The United States Navy-Marine Corps Court of Criminal Appeals (NMCCA) reversed the military judge and Appellant appealed to this Court.

Because the Government's curative measures failed to address the damage Col Shaw's statements inflicted on Appellant's relationship with his military counsel, we conclude that the Government failed to meet its burden of proving beyond a reasonable doubt that UCI would not affect the proceedings. We correspondingly find that Appellant was prejudiced as a result of the violation of his Article 38(b) right to counsel.[1] Accordingly, we reverse the

---

[1] *See* 10 U.S.C. § 838(b) (2018) (granting courts-martial defendants the right to detailed military defense counsel or to military counsel of their own selection if that counsel is reasonably available).

decision of the NMCCA and reinstate the military judge's decision to dismiss the case with prejudice.[2]

## I. Background

The Government charged Appellant with violating a lawful order, involuntary manslaughter, negligent homicide, and obstructing justice in violation of Articles 92, 119, 134, and 131b, UCMJ, 10 U.S.C. §§ 892, 919, 934, 931b (2018). Appellant retained civilian defense counsel in January 2019. Appellant further requested that Capt Thomas be assigned as his individual military counsel in March 2020. His request was approved, and Capt Thomas was detailed as individual military counsel. Capt Riley was detailed as Appellant's second military counsel.

### A. Col Shaw's Meeting with Camp Lejeune's Defense Services Office

During his November 18, 2021, meeting at Camp Lejeune, North Carolina, with the Marine Corps JAGs, Col Shaw explained the impending creation of a new billet in which a senior judge advocate, as opposed to a convening authority, would be the referral authority for certain crimes. In response to the explanation of the new billet, Capt Thomas asked what would be done to protect the attorney acting as a convening authority from outside influences. To illustrate his point, Capt Thomas referenced the existing measures that protect defense counsel from similar pressures.

In response, Col Shaw stated that defense attorneys "may think they are shielded, but they are not protected." He continued, "[y]ou think you are protected but that is a legal fiction," or words to that effect. Col Shaw then squared his shoulders to Capt Thomas and said "Capt Thomas, I know who you are and what cases you are on,

---

[2] Because we afford Appellant relief based on actual UCI, we need not determine whether Col Shaw's statements placed an intolerable strain on the public's perception of the military justice system or how recent amendments to Article 37, UCMJ, 10 U.S.C. § 837 (Supp. I 2019-2020), affect this Court's apparent UCI jurisprudence.

and you are not protected." Finally, Col Shaw alluded to the fact that the Marine Corps JAG community is small and that superiors sitting on promotion boards will know what "you did." To illustrate his point, Col Shaw referenced judge advocates who had served as defense counsel for extended periods of time who, in his view, should have been promoted but were not.

Following the meeting, Capt Thomas believed that continuing to represent Appellant would put his military career in jeopardy. Although Capt Riley was not at the meeting, after hearing about what Col Shaw said, he also believed that he could no longer zealously represent Appellant without putting his career in jeopardy. Capt Thomas and Capt Riley shared their concerns with Appellant, which caused him to doubt their loyalty to him and his defense.

### B. Appellant's Motion to Dismiss for Actual and Apparent UCI

On December 10, 2021, Appellant filed a motion to dismiss for actual and apparent UCI in which he alleged Col Shaw's statements prejudiced his attorney-client relationship with Capt Thomas. Specifically, Appellant asserted that Col Shaw's statements created a conflict of interest between Appellant and Capt Thomas whereby Capt Thomas had to "choose between potential billet assignments and promotion opportunities . . . and zealously representing [Appellant]."

The Government responded by arguing that Appellant failed to show some evidence of UCI and that, even if he did, the Government met its burden of proving that Col Shaw's statements would not affect the proceedings. In support of its argument, the Government pointed to several facts that, in its view, demonstrated that Col Shaw's comments would not affect the proceedings.

The Government first noted two curative measures the Marine Corps took in response to Col Shaw's inappropriate remarks. First, Major General (Maj Gen) Bligh, the Staff Judge Advocate to the Commandant of the Marine Corps,

issued an affidavit stating that the Marine Corps does not punish JAGs who serve in defense billets. And second, that he permanently removed Col Shaw from his role overseeing the slating process for Marine Corps JAGs. The Government also pointed out three reasons why it believed that Capt Thomas and Capt Riley's fears about their careers were unreasonable. The Government noted that: (1) there are "substantially high percentages of O-5's and O-6's" who have served in defense billets; (2) several members of the Manpower Management Division and the Judge Advocate Division submitted affidavits describing the promotion and assignment process that indicated that service in defense billets does not adversely affect the careers of JAGs; and (3) Capt Thomas had been selected for a prestigious assignment for his next billet notwithstanding his service as a defense counsel.

### C. The Article 39(a) Session

On December 21, 2021, the military judge held an Article 39(a)[3] session to litigate Appellant's motion to dismiss and to determine whether Appellant or his military counsel wished to sever the attorney-client relationship as a result of the alleged conflict of interest. The military judge began the Article 39(a) session by finding that Appellant met his burden of presenting some evidence of UCI, thus shifting the burden to the Government to prove that the UCI would not affect the proceedings.

Then, before allowing the Government to present its argument on whether the UCI would affect the proceedings, the military judge addressed the alleged conflict of interest between Appellant and his military counsel. He asked both Capt Thomas and Capt Riley whether they believed that a conflict still existed regardless of the remedial actions taken by Maj Gen Bligh.

---

[3] *See* 10 U.S.C. § 839(a) (2018) (authorizing the military judge to hold proceedings outside the presence of the members for certain purposes).

Both stated that they did, and both affirmed their desire to withdraw from Appellant's case.

Following his colloquy with defense counsel, the military judge informed Appellant of his right to be represented by conflict-free counsel. He further explained that Capt Thomas and Capt Riley could only be excused either with Appellant's consent or based on their motion to withdraw for good cause shown. After taking a short recess to allow Appellant to consult with conflict-free counsel, Appellant reluctantly consented to the withdrawal. As a result, the military judge granted Capt Thomas's and Capt Riley's motions to withdraw and excused them before litigating the remainder of the UCI issue. To allow the parties additional time to research and brief the UCI issue, the military judge concluded the Article 39(a) session and continued it a month later on January 20, 2022.

### D. The Military Judge's Order

On February 9, 2022, the military judge granted Appellant's motion and dismissed all charges and specifications with prejudice. He explained that Col Shaw's actions constituted actual and apparent UCI, creating an "intolerable tension and conflict between [Appellant] and his specifically requested military counsel." He further found that the Government's curative measures failed to prove beyond a reasonable doubt that the UCI would not affect the proceedings. Finally, the military judge held that Col Shaw's actions materially prejudiced Appellant's right to counsel and concluded, after considering a variety of remedies, that dismissal with prejudice was the only appropriate relief.

The Government appealed the military judge's order to the NMCCA which reversed and remanded. Appellant appealed the NMCCA's decision, and we granted review of the following issue:

> Whether the military judge erred when he found the Government failed to prove that unlawful command influence (1) would not affect the proceedings beyond a reasonable doubt, and (2) has not placed an intolerable strain on the public's perception of the military justice system?

*United States v. Gilmet*, 83 M.J. 251 (C.A.A.F. 2023) (order granting review).

## II. Discussion

This Court reviews allegations of UCI de novo. *United States v. Barry*, 78 M.J. 70, 77 (C.A.A.F. 2018). We accept as true the military judge's findings of fact on a motion to dismiss for UCI unless those findings are clearly erroneous. *United States v. Proctor*, 81 M.J. 250, 255 (C.A.A.F. 2021) (citing *United States v. Stirewalt*, 60 M.J. 297, 300 (C.A.A.F. 2004)).

Article 37(a)(3), UCMJ, prohibits, in relevant part, any person subject to the UCMJ from "attempt[ing] to coerce, or, by any unauthorized means, attempt[ing] to influence the action of a court-martial." 10 U.S.C. § 837(a)(3) (Supp. I 2019-2020). To establish a prima facie claim of actual UCI, the accused bears the burden of presenting "some evidence" of UCI—facts that if true, would constitute UCI. *United States v. Biagase*, 50 M.J. 143, 150 (C.A.A.F. 1999) (internal quotation marks omitted) (citation omitted). Although this initial burden is low, the accused must present more than mere allegations or speculation. *Id.* Once the accused satisfies his burden, the burden shifts to the Government to prove beyond a reasonable doubt that the UCI will not affect the proceedings.[4] *Id.* at 150-51.

### A. Some Evidence

Prior to the Article 39(a) session, Appellant presented evidence, in the form of affidavits, establishing what Col Shaw said at the November 18, 2021, meeting with Camp Lejeune's Defense Services Office. The Government did not contest the factual accuracy of Appellant's representations of Col Shaw's statements, and it later conceded before the lower court that Col Shaw's statements constituted "some

---

[4] In the alternative, the Government can also disprove the predicate facts upon which the UCI allegation is based or persuade the Court that the facts do not constitute UCI. *Biagase*, 50 M.J. at 151. Neither of these methods of rebutting the accused's prima facie case is at issue here.

evidence" of UCI. Brief for Appellant at 40 n.3*, United States v. Gilmet*, No. 202200061 (N-M. Ct. Crim. App. May 31, 2022). We agree with both parties that Appellant met his burden of presenting "some evidence" of UCI. We therefore move on to whether the Government met its burden of proving beyond a reasonable doubt that Col Shaw's statements would not affect the proceedings.

### B. The UCI's Effect on the Proceedings

The Government asserts that Appellant is not entitled to relief for two reasons. First, the Government argues that the military judge erred because, by excusing counsel before it could put on argument regarding its curative measures, he circumvented this Court's established UCI framework. Second, the Government claims that notwithstanding the order in which the military judge addressed the motions, it still met its burden because of the alleged falsity of Col Shaw's statements and the curative measures that the Marine Corps took after Col Shaw made his inappropriate comments.[5] We find both arguments unpersuasive.

Rule for Courts-Martial (R.C.M.) 801(a)(3) (2019 ed.) grants military judges the authority to "exercise reasonable control over the proceedings." This authority includes control over "when, and in what order, motions will be litigated." R.C.M. 801(a)(3) Discussion. At the Article 39(a) session in which Appellant's motion to dismiss was litigated, the military judge began by addressing the perceived conflict of interest between Appellant and his military counsel. The reason, he explained, was to determine whether the curative measures that the Government introduced in its response to the motion to dismiss mooted the conflict issue. Appellant's counsel stated that,

---

[5] We note that the Government characterizes this second argument broadly as "curative measures." Because we do not agree that the facts presented by the Government to establish the falsity of Col Shaw's statements qualify as curative measures, we distinguish between those facts and the actions taken by the Marine Corps in response to Col Shaw's statements.

notwithstanding the Marine Corps's response to Col Shaw's UCI—and after consulting the rules of professional responsibility, their state bar licensing authorities, and their supervisory attorney—they still believed that a conflict existed. In light of the continuing conflict, the military judge informed Appellant of his right to be represented by conflict-free counsel, which ultimately led to Appellant's consent to the withdrawal of his military counsel.

Contrary to the Government's claim that the military judge circumvented this Court's established UCI framework, we interpret the military judge's decision to address the conflict-of-interest issue at the outset as an attempt to determine to what extent the UCI infected the proceedings. Once he learned that Appellant's military counsel still believed a conflict existed, it was within the military judge's discretion under R.C.M. 801(a)(3) to explore the conflict issue to ensure that the proceedings did not continue until Appellant obtained conflict-free counsel or consented to being represented by conflicted counsel. *See United States v. Murphy*, 50 M.J. 4, 10 (C.A.A.F. 1998) (noting that military judges have "a *sua sponte* duty to resolve conflict questions on the record"). Although the military judge's inquiry concluded with the withdrawal of Appellant's military counsel, he did not abuse his discretion by fully resolving the conflict-of-interest issue before hearing argument from the Government regarding whether it met its burden with respect to the UCI.

We now turn to the Government's attempt to demonstrate that the UCI would not affect the proceedings and hold that the Government failed to meet its burden. At trial and before this Court, the Government pointed to the following facts to prove that the UCI would not taint the proceedings: (1) Maj Gen Bligh's affidavit; (2) Col Shaw's suspension and permanent removal from the slating process for Marine Corps JAGs; and (3) several facts that supposedly undermine Capt Thomas and Capt Riley's concerns. All of this evidence, however, focused primarily on demonstrating either the apparent falsity of Col Shaw's statements or the alleged unreasonableness of Appellant's

counsels' fears. It did nothing to address the damage that Col Shaw's statements had on Appellant's relationship with his military counsel.

### 1. Maj Gen Bligh's Affidavit

Maj Gen Bligh's affidavit—which we characterize broadly as the command's attempt to remedy the UCI—asserted that "service as a defense counsel is vital to overall mission success, and will in no way be detrimental to an individual's career." This generic response to the misconduct of a senior officer does not approach the type of curative measures from the command that this Court has found sufficient in the past.

For example, in *United States v. Rivers*, we held that the command's remedial measures sufficiently cured the UCI. 49 M.J. 434, 443 (C.A.A.F. 1998). In that case, the appellant, who was convicted of drug-related offenses, alleged multiple instances of UCI. As relevant here, he alleged that his battery commander, Capt Gillroy, prevented witnesses from testifying on his behalf by discouraging fellow soldiers from associating with those involved with drugs. *Id.* at 440. In response, the government took a variety of corrective actions. Most notably, Capt Gillroy convened another battery meeting at which he "retracted his prior remarks, apologized for having overstepped proper legal bounds, and assured his soldiers that no adverse consequences would befall any soldier who testified as a witness for an alleged offender." *Id.* Capt Gillroy's battalion commander and the division artillery commander attended the meeting—which was recorded for any soldier who could not attend—and personally reinforced Capt Gillroy's comments. *Id.* At trial, the military judge found that notwithstanding Capt Gillroy's inappropriate comments, " 'no person . . . who ha[d] been identified as a potential witness ha[d] refused to testify for the accused.' " *Id.* at 441 (alterations in original).

Here, unlike in *Rivers*, the command failed to take the necessary steps to purge the effects of the UCI from Appellant's trial. First, there is no reason to believe that Maj Gen Bligh's affidavit would be seen by those present at Col

Shaw's meeting. It was not produced until *after* Appellant filed his motion to dismiss and nothing in the record suggests that it was published or distributed to anyone at Camp Lejeune. The record gives no indication that the affidavit was anything more than a litigation tactic produced in response to ongoing legal proceedings rather than an affirmative attempt to ensure that the military defense counsel affected by Col Shaw's statements were made aware of the command's disapproval. This stands in stark contrast to the actions of the command in *Rivers*, which ensured that every person who was present for Capt Gillroy's inappropriate comments could hear—either in person or through a recording—his retraction and apology.

Second, Col Shaw failed to take responsibility for his own actions in response to his inappropriate remarks, and Maj Gen Bligh failed to admonish him. In a signed affidavit, Col Shaw claimed that he did not know Capt Thomas, nor did he recall speaking to him. This statement was later contradicted by evidence that Col Shaw had texted another officer about Capt Thomas and that he had requested information about Capt Thomas's billet consideration. Further, there is no evidence to suggest that Col Shaw volunteered to clarify his remarks to those present at the meeting. There is similarly no evidence that Maj Gen Bligh, or any of Col Shaw's other superior officers, encouraged him to do so. Instead, Maj Gen Bligh merely stated that "[Col] Shaw's alleged comments do not reflect his views or guidance."

Unlike in *Rivers,* where the perpetrator of the UCI personally disavowed the inappropriate remarks, here, Col Shaw denied that his remarks were inappropriate and dismissed concerns over his actions as "purely [a] misunderstanding and speculative at best." Col Shaw's response to his misconduct did nothing to mitigate the effect of his comments on Appellant's relationship with his military counsel. If anything, Col Shaw's actions undercut the Government's attempt to meet its burden rather than support it.

Third, we cannot ignore the findings of the military judge. In *Rivers*, the military judge noted that every potential witness who could have refused to testify because of Capt Gillroy's comments opted to testify. But here, the military judge found that both the relevant people who could have been negatively impacted by Col Shaw's statements—Capt Thomas and Capt Riley—were. As discussed further below, this finding is supported by the record and is not clearly erroneous. *See infra* Part II.C.

### 2. Col Shaw's Removal from the Slating Process

The Government's assertion that the removal of Col Shaw from the slating process for Marine Corps JAGs mooted any conflict between Appellant and his military counsel also misses the mark. Col Shaw never intimated that he would personally derail the careers of military defense counsel. Rather, he described a pervasive mindset throughout the Marine Corps JAG community that causes defense counsels' careers to stall out because of their service in defense billets. Removing Col Shaw from his position did nothing to cure the perception that other Marine Corps officers would punish military defense counsel in the promotion process. As a result, it also failed to assuage any concerns that Appellant or his counsel had about their ability to zealously advocate for Appellant at trial without fear of repercussions.

### 3. Facts That Allegedly Undermine Capt Thomas's and Capt Riley's Fears

In addition to the active measures the Marine Corps took to cure the UCI, the Government also points to three facts that—at least in the Government's view—demonstrate that Capt Thomas and Capt Riley's concerns about any conflict of interest were unfounded. First, the Government notes that there are "substantially high percentages of O-5's and O-6's" in the Marine Corps JAG community who have served in defense billets. Second, the Government argues that several affidavits submitted by members of the Manpower Management Division and the Judge Advocate Division describing the assignment and promotion process indicated that there are no adverse consequences

from spending time in a defense billet. And finally, the Government notes that—despite his service as a defense counsel—Capt Thomas was selected for a prestigious and competitive billet.

This part of the Government's argument is perplexing. Capt Thomas and Capt Riley expressly stated to the military judge that despite the curative measures taken by their command, they still believed that a conflict existed. This was not just a reflection of their own personal feelings, but was an informed view based on their consultation of the rules of professional responsibility, their state bar licensing authorities, and their supervising attorney. Based on this, the military judge found that Col Shaw's remarks created an "intolerable tension" between Appellant and his military counsel. Nevertheless, the Government appears to be arguing that it "cured" the UCI caused by Col Shaw's comments because Capt Thomas's and Capt Riley's concerns about any conflict of interest were never justified in the first place.

We do not find this argument persuasive. The first two facts presented by the Government are so vague as to have no bearing on this case. They do not address the specific conflict perceived by Capt Thomas and Capt Riley in any meaningful way. The third fact, while also unpersuasive, merits further discussion. In the Government's view, the fact that Capt Thomas was selected for the billet through an "exceptionally competitive process" proved that Capt Thomas's service as a defense counsel did not negatively impact his career. What the Government fails to recognize is that Capt Thomas's next billet assignment is in no way relevant to his relationship with Appellant.

Capt Thomas was selected for the prestigious billet before Col Shaw's meeting with Camp Lejeune's Defense Services Office. Although he had already been selected, Capt Thomas was not aware of his selection prior to Col Shaw's meeting. The billet assignment was not announced until December 16, 2021, six days after Appellant filed the UCI motion. The Government's focus on Capt Thomas's prestigious billet assignment, therefore, did nothing to address

the rift that had developed between Appellant and Capt Thomas between the time Col Shaw made his inappropriate remarks and the time that Appellant filed his motion to dismiss.

Even if Capt Thomas had known about his assignment before Col Shaw made his statements about defense counsel service, that one-time assignment has little to do with Capt Thomas's fear that zealously representing Appellant—and potentially successfully defending him—would jeopardize *future* assignments and promotions.

In short, the curative measures and supporting facts on which the Government relies fail to prove that the Government cured the UCI because they are aimed at fixing (or disproving) the wrong problem. The Government appears to have introduced the affidavits and testimony from the command for two reasons: (1) to prove that Col Shaw's comments were incorrect and unfounded; and (2) to demonstrate that defense counsels' belief that they were conflicted was unreasonable. But especially considering the military judge's finding that there *was* a conflict of interest, the Government needed to prove beyond a reasonable doubt that it had taken sufficient measures to ensure that that conflict did not affect Appellant's court-martial. Because the Government failed to address or remedy the broken relationship between Appellant and his military defense counsel caused by the UCI, we conclude that the Government failed to prove beyond a reasonable doubt that UCI would not affect the proceedings.

### C. Violation of Appellant's Article 38(b) Rights

Congress has granted military accused the right to detailed military counsel, military counsel of choice if reasonably available, and civilian counsel of choice at the accused's own expense. Article 38(b), UCMJ. Once an attorney-client relationship has been established, the accused is "absolutely entitled to retain [that relationship] in the absence of demonstrated good cause." *United States v. Baca*, 27 M.J. 110, 119 (C.M.A. 1988). When government actions frustrate the continuation of an established

attorney-client relationship, this Court has held that the accused's Article 38(b) rights were violated as a result. *United States v. Eason*, 21 C.M.A. 335, 338-39, 45 C.M.R. 109, 112-13 (1972).

Here, the military judge found that Appellant was presented with a Hobson's choice and that he never would have consented to the withdrawal of his military counsel but for Col Shaw's actions. He further found that Col Shaw's actions created an "intolerable tension" between Appellant and his military counsel that required Appellant to forego their services.

The military judge's factual findings are supported by the record. In the affidavit that he submitted to the military judge, Appellant explained that his relationship with Capt Thomas prior to November 2021 was one of "complete trust." He described Capt Thomas as "one of the hardest working and most dedicated people [he had] ever met." He went on to note that Capt Thomas "fought for [him] at every turn" and "made [him] feel that [his] case was the most important one he had ever handled." Appellant similarly praised Capt Riley, describing him as an "enthusiastic and dedicated attorney" for whom he had "developed a great deal of trust."

After Col Shaw's remarks, however, Appellant noticed that Capt Thomas and Capt Riley's representation of him changed. He ultimately concluded that while he wanted Capt Thomas and Capt Riley to continue representing him, "the influence from Col Shaw made this impossible." The perceived shift in Capt Thomas and Capt Riley's zealous representation of Appellant provides sufficient evidence to support the military judge's findings that Appellant would not have consented to release of his military counsel absent Col Shaw's statements and that Appellant was required to forego Capt Thomas's and Capt Riley's services as a result.

Accepting the military judge's findings of fact as true, we have no choice but to conclude that Appellant's Article 38(b) rights were violated. R.C.M. 505(d)(2)(B) specifies the only ways in which an established attorney-client

relationship may be severed. As relevant here, defense counsel may be excused upon request of the accused or application for withdrawal by defense counsel for good cause shown. R.C.M. 505(d)(2)(B) (referencing R.C.M. 506(c)); *see also* R.C.M. 506(c) (explaining that "defense counsel may be excused only with the express consent of the accused, or by the military judge upon application for withdrawal by defense counsel for good cause shown").

The Government argues that Appellant's Article 38(b) rights were not violated because he consented to the withdrawal of his counsel. We disagree. The military judge, in our view, properly determined that the Government's improper interference with Appellant's established attorney-client relationship compelled Appellant to choose between waiving the conflict of interest and waiving his right to continued representation by his selected counsel. Although an accused may waive the rights afforded by Article 38(b), UCMJ, Appellant's decision to allow his counsel to withdraw under such pressure is not an "action . . . that can fairly be construed as a voluntary waiver of the attorney-client relationship." *United States v. Edwards*, 9 M.J. 94, 95 (C.M.A. 1980).

We further hold that the Government's impropriety materially prejudiced Appellant's substantial rights. In *Eason*, our predecessor Court found prejudice when government action severed the appellant's attorney-client relationship. 21 C.M.A. at 338, 45 C.M.R. at 112. There, the appellant committed crimes in Vietnam and established an attorney-client relationship with Capt Provine. *Id.* at 335, 45 C.M.R. at 109. When the appellant's case was transferred to the United States, the appellant requested that Capt Provine be transferred so that he could continue his representation. After the government refused to allow Capt Provine to leave Vietnam, our predecessor Court found prejudice because of "the government's frustration of the continuance of a proper attorney-client relationship." *Id.* at 336, 338, 45 C.M.R. at 110, 112 (citation omitted).

While not all Article 38(b) violations will result in a finding of prejudice, the character of the *government* action

in frustrating an existing attorney-client relationship is an important consideration when conducting the prejudice inquiry. *See United States v. Hutchins*, 69 M.J. 282, 291 (C.A.A.F. 2011) (declining to find prejudice and noting that "the personnel action leading to the severance . . . resulted from a request initiated by the assistant defense counsel, not by the prosecution or the command"). Although the Government did not actively restrict Capt Thomas and Capt Riley from representing Appellant, its failure to address the conflict of interest created by Col Shaw's comments prevented Capt Thomas and Capt Riley from adequately representing Appellant. The result was the same. The Government prejudiced Appellant's Article 38 rights by creating the perception in the minds of Appellant's defense counsel that their future in the Marine Corps would be jeopardized if they continued to zealously advocate for Appellant. *See Holloway v. Arkansas*, 435 U.S. 475, 486 n.9 (1978) (explaining that "[w]hen a considered representation regarding a conflict in clients' interests comes from an officer of the court, it should be given the weight commensurate with the grave penalties risked for misrepresentation").

As such, we hold that Appellant was prejudiced by Col Shaw's improper interference with Appellant's established attorney-client relationship.

### D. Remedy

At oral argument, the Government argued—for the first time—that even if Appellant suffered prejudice to a substantial right, the military judge erred by dismissing Appellant's case with prejudice instead of imposing some lesser remedy. There may be merit to this argument, but the trouble for the Government is that it never raised it before doing so before this Court. We decline to entertain the Government's untimely argument in this appeal. *See, e.g., United States v. Muwwakkil*, 74 M.J. 187, 191-92 (C.A.A.F. 2015) (declining to entertain an argument by the government that it failed to raise below); *Giordenello v. United States*, 357 U.S. 480, 488 (1958) (refusing to

entertain the government's belated contentions not raised in the lower courts).

### III. Conclusion

The decision of the United States Navy-Marine Corps Court of Criminal Appeals is reversed. The military judge did not err when he found that the Government failed to prove that UCI would not affect the proceedings beyond a reasonable doubt. We therefore reinstate his decision to dismiss the charges and specifications with prejudice.