UNITED STATES, Appellee,

v.

Sheldon L. RIVERS, Specialist,
U.S. Army, Appellant.

No. 97–0583.
Crim.App. No. 9401059.

U.S. Court of Appeals for
the Armed Forces.

Argued March 3, 1998.

Decided Oct. 1, 1998.

For Appellant: *Captain Angelines McCaffrey* (argued); *Colonel John T. Phelps, II* and *Major Leslie A. Nepper* (on brief); *Lieutenant Colonel Michael L. Walters* and *Captain Mark I. Goodman.*

For Appellee: *Captain Chris A. Wendelbo* (argued); *Colonel Joseph E. Ross* and *Lieutenant Colonel Frederic L. Borch, III* (on brief); *Major Lyle D. Jentzer* and *Captain John M. Bergen.*

*Opinion of the Court*

GIERKE, Judge:

A military judge sitting as a general court-martial[1] convicted appellant, contrary to his pleas, of two specifications of distributing

---

1. The decision of the Court of Criminal Appeals incorrectly recites that appellant was tried by a "court-martial composed of officer and enlisted members." 44 MJ at 839–40.

cocaine, in violation of Article 112a, Uniform Code of Military Justice, 10 USC § 912a. The adjudged and approved sentence provides for a bad-conduct discharge, confinement for 18 months, forfeiture of $300.00 pay per month for 6 months, and reduction to the lowest enlisted grade. The Court of Criminal Appeals affirmed the findings and sentence. 44 MJ 839 (1996).

This Court granted review of the following issues:

## I

WHETHER APPELLANT WAS DENIED ADEQUATE APPELLATE REVIEW BECAUSE THE MILITARY JUDGE ORDERED PART OF THE RECORD OF TRIAL SEALED AND THE ARMY COURT OF CRIMINAL APPEALS REFUSED TO ALLOW APPELLATE COUNSEL ACCESS TO THE SEALED PORTION OF THE RECORD.

## II

WHETHER APPELLANT WAS DENIED HIS FUNDAMENTAL RIGHT OF MILITARY DUE PROCESS WHERE APPELLATE COUNSEL WAS PREVENTED FROM REVIEWING THE ENTIRE RECORD OF TRIAL, SPECIFICALLY, APPELLATE DEFENSE COUNSEL WAS NOT ALLOWED TO REVIEW PROSECUTION EXHIBIT 1 WHICH WAS RULED INADMISSIBLE BY THE MILITARY JUDGE.

## III

WHETHER THE ATMOSPHERE OF UNLAWFUL COMMAND INFLUENCE AT THE DIVISION AND BATTERY LEVELS POLLUTED THE PROCEEDINGS AND WAS TO THE SUBSTANTIAL PREJUDICE OF APPELLANT.

## IV

WHETHER THE MILITARY JUDGE ABUSED HIS DISCRETION TO THE SUBSTANTIAL PREJUDICE OF APPELLANT BY NOT RECUSING HIMSELF OR GRANTING A MISTRIAL WHERE HE HAD PRESIDED OVER THE TRIAL OF THE CO-ACCUSED AND WHERE THE PROSECUTOR INFORMED THE MILITARY JUDGE, PRIOR TO FINDINGS, THAT APPELLANT HAD PREVIOUSLY SUBMITTED AN OFFER TO PLEAD GUILTY.

## V

WHETHER THE MILITARY JUDGE SHOULD NOT HAVE DENIED THE DEFENSE MOTION FOR EMPLOYMENT OF AN EXPERT WITNESS ON THE SUBJECT OF IDENTIFICATION.

We affirm, for the reasons set out below.

### ISSUES I & II: ACCESS TO SEALED DOCUMENTS

#### Facts

A key government witness, EW, was an informant for the Criminal Investigation Command (CID). At trial the defense requested access to three sworn statements by EW and three entries on the investigating agent's "activity summary." The Government asserted that the requested information was irrelevant and asserted a privilege under Mil.R.Evid. 506, Manual for Courts–Martial, United States, 1984, arguing that disclosure of the information would endanger EW, the informant. Defense counsel argued that the evidence should be disclosed because it might reveal prior inconsistent statements, "things that bear very definitely on [EW's] credibility" in other drug transactions, and a possible entrapment defense based on EW's *modus operandi* in other cases.

After examining the evidence *in camera* and hearing the arguments of both sides, the military judge denied the defense request for disclosure. He ruled that EW's three sworn statements and the CID's investigative notes were not relevant. He found that the evidence described EW's "informant activities involving matters totally unconnected to the pending trial." He further found that the evidence did not contradict any information already disclosed to the defense or provide

any impeachment evidence that was not already available.

Defense counsel then requested permission to question EW under oath in open court, arguing that EW had been evasive and untruthful at the Article 32, UCMJ, 10 USC § 832, investigation and in pretrial interviews. Defense counsel already knew about EW's involvement in drug transactions with persons named Jones, McKenzie, Hopkins, Marshall, and "CJ," but wanted to ask him about other transactions and his relationship with an automobile glass tinting business.

The military judge called EW as a witness for the court. During this testimony, EW revealed a name contained in the sealed documents that the military judge earlier had ruled to be protected under Mil.R.Evid. 506. The military judge lifted his protective order with respect to that name, but still opined that the information was irrelevant. The military judge ordered the Government to disclose two of EW's three sworn statements (one statement with two names redacted), and to disclose one entry on the CID agent activity reports.

The Court of Criminal Appeals examined the sealed documents *in camera* and held that they "revealed nothing relevant or material to the defense." 44 MJ at 841. The court also rejected appellant's claim that refusal to disclose the sealed documents to appellate defense counsel deprived appellant of "adequate appellate review." *Id.* at 840, 841.

### Discussion

■ Before this Court, appellant contends that the lower court's refusal to unseal the documents prevents appellant from obtaining meaningful review of the military judge's decision to seal the documents. *See United States v. Branoff*, 38 MJ 98 (CMA 1993). The Government asserts that the military judge and the Court of Criminal Appeals followed the correct procedure by examining the documents *in camera* and that the court below correctly concluded that the sealed documents were irrelevant to appellant's case.

Mil.R.Evid. 506(a) provides a privilege from disclosure of government information "if disclosure would be detrimental to the public interest." Mil.R.Evid. 506(i) provides for an *in camera* proceeding to determine if information should be disclosed when the Government asserts a privilege under this rule. RCM 701(g)(2), Manual, *supra*, authorizes a military judge to examine evidence *in camera*, issue protective orders if necessary, and order evidence "sealed and attached to the record ... as an appellate exhibit," to be reviewed by appellate authorities "in closed proceedings." RCM 701(g)(2) is based on Fed.R.Crim.P. 16(d)(1). Drafters' Analysis of RCM 701(g)(2), Manual, *supra* at A21–33. In *United States v. Romano*, 46 MJ 269, 275 (1997), this Court directed the Court of Criminal Appeals to examine documents *in camera* to determine if they were privileged from disclosure to appellate defense counsel.

■ A military judge's ruling denying disclosure of documents to the defense on grounds of privilege is reviewed for abuse of discretion. *See Romano*, 46 MJ at 274; *Branoff*, 38 MJ at 104; *United States v. Garcia*, 625 F.2d 162, 166 (7th Cir.1980); *see also* 2 W. LaFave & J. Israel, *Criminal Procedure* § 19.3(i) at 501 (1984) (trial judge has "broad discretion").

■ This Court recognizes that independent appellate review is not the equivalent of the assistance of counsel. *See United States v. Ortiz*, 24 MJ 323, 325 (CMA 1987). Likewise, the Supreme Court has recognized that "the eye of an advocate may be helpful to a defendant in ferreting out information." *Pennsylvania v. Ritchie*, 480 U.S. 39, 59, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987) citing *Dennis v. United States*, 384 U.S. 855, 875, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966). However, the Supreme Court also has recognized that the defense is not entitled to unrestricted access to government information. *Ritchie, supra* at 59, 107 S.Ct. 989. Where a conflict arises between the defense search for information and the Government's need to protect information, the appropriate procedure is *"in camera* review" by a judge. *Id.* at 61, 107 S.Ct. 989; *see United States v. Nixon*, 418

U.S. 683, 706, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974).

In this case, the military judge and the court below complied with the procedures set out in Mil.R.Evid. 506(i), RCM 701(g)(2), the Supreme Court's guidance in *Ritchie,* and our decision in *Romano.* We agree with the Government that *Branoff,* is distinguishable from this case on its facts. In *Branoff,* the evidence had been disclosed to trial defense counsel, leaving no valid purpose to be served by withholding it from appellate defense counsel. 38 MJ at 103.

This Court has examined the sealed exhibits after reviewing the record of trial and, like the court below, has concluded that the exhibits contain nothing relevant to appellant's case. Thus we hold that the military judge and the court below did not abuse their discretion.

### ISSUE III: UNLAWFUL COMMAND INFLUENCE

Appellant asserts that three incidents of unlawful command influence made his court-martial unfair:

(1) A command memorandum on "Physical Fitness and Physical Training," issued by Major General (MG) Keane, the general court-martial convening authority;

(2) Remarks by Captain (CPT) Gillroy, the battery commander, to appellant's unit about drug dealers; and

(3) Intimidation of defense alibi witnesses by the battery first sergeant and trial counsel.

At trial and before the court below, the Government conceded that the first two incidents of unlawful command influence occurred, but asserted that the Government had shown beyond a reasonable doubt that the unlawful command influence had not tainted appellant's trial. With respect to the alleged intimidation of alibi witnesses, the Government asserts that no unlawful command influence occurred.

### Facts

On July 30, 1993, over 2 months before appellant's offenses were committed, MG Keane (then a brigadier general) issued a memorandum on "Physical Fitness and Physical Training." MG Keane expressed his view "that a soldier's body is a weapon system, and that our charge as commanders is to help our soldiers condition their bodies and avoid abusing them." His concept was that "physical fitness ... goes beyond the morning PT [physical training] session" and that "[i]t must include attention to diet and weight control, encouragement to avoid the use of nicotine products, and programs to avoid abuse of alcohol and the use of drugs." After giving detailed guidance to his commanders about physical fitness training, MG Keane's memorandum contained comments under the heading, "Other Components of Physical Fitness." These comments included the following:

> A healthy diet, for example, is essential to overall good health, and we must promote this in our dining facilities and in our discussions with our soldiers. We must also educate our soldiers on the risks of smoking, dipping snuff, and chewing tobacco. We must encourage those who use tobacco products to stop, and try to keep those who don't use them from starting. Similarly, we should educate our soldiers on the enormous price—personally as well as professionally—of alcohol abuse and of driving after drinking. Alcohol abusers must be identified, treated, and rehabilitated or separated from the service. There also is no place in our Army for illegal drugs or for those who use them.

MG Keane testified about this memorandum in a companion case tried before appellant's, and the parties submitted a transcript of his previous testimony as a stipulation of expected testimony in appellant's case. MG Keane had testified that the purpose of his memorandum was to document his oral guidance to commanders on the importance of physical training and the "cultural change" he intended to make in physical training. The memorandum was drafted by the G–3 (assistant chief of staff for plans, training, and mobilization) after discussions with the general, and MG Keane made numerous changes. MG Keane entrusted his chief of

staff with coordinating the memorandum with various staff members, including the staff judge advocate (SJA).

A stipulation of fact describes the staffing of the memorandum. The chief of staff forwarded the draft memorandum to the SJA. The document was delivered by a member of the general staff, who requested that the SJA review the document immediately while he waited. The SJA recommended changing a sentence from "[t]here also is no place in our Army for drugs or those who use them" to "there is no place in our Army for illegal drugs."

The G–3 "intended to incorporate the SJA's" recommended change, but he failed to remove the words, "or those who use them." MG Keane made other changes to the document but failed to remove the words objected to by the SJA. The revised but unexpurgated memorandum was signed and published to all commanders at Fort Campbell.

During the week of August 23–27, 1993, the SJA learned that the memorandum had been published with the objectionable language retained. On August 24, while MG Keane was en route to Korea to participate in an exercise, the SJA asked a member of MG Keane's staff to send an electronic message to MG Keane expressing his concerns about the language in the memorandum that could be construed as unlawful command influence. On August 26, MG Keane's chief of staff responded by electronic message as follows:

Not clear why SJA finds reference to drugs in PT policy letter to be objectionable. Haven't discuss [sic] with CG, but suspect he'll be reluctant to make a big deal about it. Why not leave as is?

Believing that MG Keane was unaware of his concerns, the SJA sent him a facsimile message on the same day, fully describing his concerns about unlawful command influence. That very day, MG Keane personally telephoned the SJA upon receiving his facsimile message. MG Keane "directed that all copies of the PT memorandum be located, collected and replaced with a new memorandum that excluded the objectionable language." A new memorandum labeled "cor-

rected copy" was published on August 27, 1993. In the corrected copy the entire sentence that had been modified by the SJA was deleted. MG Keane directed that "every commander ... return" the July 30 memorandum "and sign for the revised memorandum."

On October 27, 1993, after an issue of unlawful command influence was raised in another case, MG Keane published a memorandum entitled, "Command Obligations Regarding Military Justice." The memorandum includes the following:

Due to an administrative oversight, a policy memorandum, subject: Physical Fitness and Physical Training, dated 30 July 1993, inaccurately presented my view toward drug offenders.

a. Any suggestion that I believe all drug offenders must be discharged from the service is simply an inaccurate reading of both my personal and professional philosophy. My intent in issuing the policy was to convey my thoughts on physical training, health, and life-style issues. The memorandum was not intended and should not be read to express a command philosophy on drug offenders. The memorandum was replaced with a corrected copy, dated 27 August 1993.

b. My policy on the disposition of military justice cases is expressed above. I strongly believe all soldiers deserve an individual assessment of their cases.

In his stipulated testimony, MG Keane testified that he overlooked the objectionable language when he read the draft quickly. He was "in disbelief" when he found out that the language was still in the published memorandum. Contrary to his chief of staff's view, MG Keane testified that the objectionable language "became a big deal," because it did not reflect his views. Regarding his SJA's advice on the original memorandum, MG Keane testified:

I never saw anything that indicated from the SJA that those words should have been deleted. I mean, I think common sense says that if I saw those words that he wanted deleted, they would have been de-

**440**

leted. I wish I had. We wouldn't be discussing this.[2]

Appellant was apprehended on October 1, 1993, for distributing cocaine on September 10 and 13, 1993. At a battery PT formation on October 4, 1993, the battery commander, CPT Gillroy, told his soldiers that they were entitled to a drug-free battery, that there were drug dealers in the battery, and that they should stay away from those involved with drugs. CPT Gillroy testified at appellant's trial that MG Keane's memorandum had no connection to his remarks, but that he was reacting to the apprehension of two of his soldiers for dealing in drugs. He spoke extemporaneously and without consulting with anyone beforehand. Because of concerns that some soldiers might be intimidated by CPT Gillroy's remarks from testifying on behalf of the two accused soldiers, MG Keane ordered an administrative investigation under the provisions of Army Regulation (AR) 15–6. As a result of that investigation, CPT Gillroy received a written reprimand from MG Keane.

On January 13, 1994, CPT Gillroy convened a battery meeting at Faith Chapel on Fort Campbell, at which he retracted his prior remarks, apologized for having overstepped proper legal bounds, and assured his soldiers that no adverse consequences would befall any soldier who testified as a witness for an alleged offender. CPT Gillroy's battalion commander and the division artillery commander attended the meeting and reinforced CPT Gillroy's comments. The meeting was videotaped for soldiers who were not present at the meeting.

The testimony of 22 soldiers who testified at the AR 15–6 investigation was offered by defense counsel and received in evidence as stipulations of expected testimony. Ten soldiers whose testimony was not offered by stipulation testified personally at the court-martial.

Two noncommissioned officers, including the former battery first sergeant, testified that they thought soldiers might not be willing to get involved in appellant's court-martial as a result of the battery commander's remarks. Nine noncommissioned officers and four specialists believed that others would be afraid to testify. Of these, nine stated that they personally were not afraid to testify. Two other noncommissioned officers and six enlisted soldiers stated that they were not afraid of adverse consequences if they testified. One enlisted soldier testified that he was afraid of adverse consequences if he testified. One noncommissioned officer stated that he was afraid of the consequences but "had to do the right thing."

After his remarks at the PT formation on October 4, CPT Gillroy had conversations on unrelated matters with three soldiers. During those conversations, he suggested that the soldiers avoid being associated with drug offenders. The three soldiers interpreted CPT Gillroy's remarks as suggesting that they avoid being associated with appellant.

With respect to CPT Gillroy's retraction and apology at Faith Chapel, two noncommissioned officers and three enlisted soldiers expressed doubts about CPT Gillroy's sincerity. One soldier characterized it as a "dog and pony show." Another testified that it was "something that he had to do." A third testified that he did not believe that CPT Gillroy did it voluntarily.

The underlying facts were uncontested. Trial counsel conceded that unlawful command influence had occurred, but argued that the Government had shown beyond a reasonable doubt that appellant's court-martial was untainted. The military judge denied the defense motion to dismiss the charges, making extensive findings of fact and conclusions of law to support his ruling. (Appellate Exhibit I.) The military judge found that MG Keane did not intend to commit unlawful command influence in his July 30 memorandum, but that it resulted as "an unintentional consequence of his choice of words." He found that MG Keane's October

**2.** The inadvertent filtering out of the SJA's concerns demonstrates the wisdom of the Congressional mandate that "[c]onvening authorities shall at all times communicate *directly* with their staff judge advocates or legal officers in matters relating to the administration of military justice." Art. 6(b), UCMJ, 10 USC § 806(b) (emphasis added).

27 memorandum "accurately describe[d]" his "present view on the subject of the appropriate disposition of illegal drug charges." The military judge concluded that, in light of MG Keane's "clear and effective retraction" of his July 30, 1993, memorandum, that memorandum did not pose "any threat to the conduct of a fair trial as a consequence of the GCMCA [MG Keane]'s involvement in the potential post-trial review and action on the case."

With respect to CPT Gillroy's conduct, the military judge found that his conduct had caused "many soldiers" in the battery to reasonably believe that testifying on behalf of a soldier accused of drug offenses "would be contrary to the expressed desires of their immediate commander and might subject them to adverse personal consequences." The military judge further found, however, that "no person ... who ha[d] been identified as a potential witness ha[d] refused to testify for the accused."

The military judge took note of MG Keane's and CPT Gillroy's retractions, the personal endorsement of CPT Gillroy's retraction by his two superiors, CPT Gillroy's departure from command of the battery, the administrative investigation initiated by the Government, and CPT Gillroy's reprimand for his actions. The military judge then directed the following additional corrective actions:

a. any witness who has served with the accused during the course of the accused's service in A Battery, 1st Battalion, 320th Field Artillery will be produced for the defense upon a showing of knowledge of the substance of the charges or of the accused's character or performance of military duties;

b. at the request of the defense the court will give to all appropriate witnesses an instruction at the start of their testimony directing them to report any efforts perceived as retribution based upon their testimony to the Military Judge and such witness will be given a slip of paper with the judge's name and phone numbers; and

c. CPT Gillroy will not be allowed to be at the trial situs during the course of the

trial proceedings and if he is called to testify he will have the most minimum contact possible with any other witnesses waiting at the trial situs, in accordance with specific instructions to be given by the court.

Finally, the military judge announced that he would "favorably consider" any other remedial measures requested by the defense and that he would reconsider his ruling if the accused was found guilty.

During the trial on the merits, a defense alibi witness, Sergeant (SGT) Beckwith, was called to establish that on September 13, 1993, the date of one of the alleged offenses, he was the staff duty NCO and appellant was his driver. As his testimony progressed, SGT Beckwith was vague and uncertain regarding the date of his duty. The military judge asked SGT Beckwith if he felt intimidated about testifying, and SGT Beckwith responded, "Not at all, sir.... I'm going to speak what's in my heart; that's what the Lord tells me to do."

The military judge then noticed that CPT Liddell, who succeeded CPT Gillroy as battery commander, was sitting in the courtroom. He directed CPT Liddell to depart the courtroom.

On examination by defense counsel, SGT Beckwith testified that, 2 or 3 months before the trial on the merits, the battery first sergeant had advised him and three other soldiers of their rights and had questioned them about a date involved in appellant's offenses. The first sergeant told them that they were not "suspected or accused of anything" but that "JAG wanted to know about" a certain date. SGT Beckwith testified that he did not think he and the others "were being treated unfairly ... or adversely," but that it "was a part of duty."

After convicting and sentencing appellant, the military judge reopened the inquiry concerning unlawful command influence on his own motion, based on the evidence that the first sergeant had questioned four potential alibi witnesses. The military judge scheduled a post-trial session and directed that a new trial counsel be detailed so that the two trial counsel who prosecuted appellant's case

would be available as witnesses. The military judge announced that CPT Glass, who had been excused by appellant from serving as defense counsel so that he could testify, would be made available as a witness. The military judge also directed that a civilian employee in the SJA's office be made available to testify about how defense witnesses were treated. Finally, the military judge directed counsel for both sides to provide him with names of potential witnesses on the issue of unlawful command influence.

At the post-trial hearing, testimony was taken from the former trial counsel, CPT Bovarnick; former assistant trial counsel, CPT Corn; battery commander, CPT Liddell; battery first sergeant, 1SG Knowles; and two alibi witnesses, SGT Beckwith and Specialist Patterson. Once again, the essential underlying facts were uncontested. CPT Glass, the former defense counsel, had notified the prosecution of a possible alibi defense and furnished the names of four potential alibi witnesses. The prosecution also knew that appellant had offered to plead guilty and was negotiating a pretrial agreement. CPT Corn, the more experienced of the two prosecutors, believed that appellant's offer to plead guilty and the potential alibi defense were inconsistent. After some discussion, CPT Corn decided that it would be advisable to have the battery commander interview the four potential alibi witnesses and to precede the interviews with Article 31(b), UCMJ, 10 USC § 831(b), warnings, including a warning that they were suspected of making false official statements.

CPT Corn testified that there was no intent to keep the witnesses from testifying, but only to prepare for trial in the event that a guilty plea was not entered or accepted as provident. The two prosecutors did not think the possibility of intimidation was "a major concern" because some of the witnesses had already come forward and testified in a companion case.

CPT Bovarnick asked CPT Liddell, the battery commander, to question the four potential alibi witnesses about "their whereabouts on a certain date and time." CPT Liddell wrote down the two questions CPT Bovarnick wanted him to ask. CPT Liddell delegated the mission to 1SG Knowles. CPT Bovarnick advised CPT Liddell to warn the soldiers of their Article 31(b) rights before questioning them, but did not say what offense to mention. CPT Liddell accepted CPT Bovarnick's advice because he regarded reading the soldiers their rights as "a safeguard for the soldiers." CPT Liddell testified that he wanted the soldiers "to know that if they didn't want to say anything, that we weren't going to strong arm them into telling us something."

1SG Knowles called the four potential witnesses into his office. He told them that the questions were requested by JAG. He and the potential witnesses were in civilian clothes because it was a non-duty day. He used a preprinted form to advise them of their rights. His Article 31(b) warning was incomplete because it did not include advice regarding the suspected offense. To the contrary, he advised them that they were not suspected of anything. On the preprinted form, the space for the suspected offense merely lists, "Statement reference 13 Sep 93." All four witnesses declined to answer questions and checked the box on the preprinted form indicating that they declined to make a statement.

SGT Beckwith testified that he did not feel threatened and thought the purpose of the interview was to help appellant. SPC Patterson testified that he would have informed defense counsel if he knew something helpful for the defense.

At the conclusion of the post-trial hearing, the military judge again made detailed findings of fact and conclusions of law. He found the facts to be as outlined above and also found that the pretrial interview of the four alibi witnesses had no effect on their trial testimony or their perception of the consequences of testifying. The military judge concluded that the questioning of the witnesses by 1SG Knowles did not amount to unlawful command influence, although he criticized the prosecution's plan to have the witnesses advised of their rights and interviewed by the battery commander as "perceptionally unwise" in light of previous ef-

forts by the command "to chill or intimidate potential witnesses."

*Discussion*

 Unlawful "[c]ommand influence is the mortal enemy of military justice." *United States v. Thomas,* 22 MJ 388, 393 (CMA 1986), *cert. denied,* 479 U.S. 1085, 107 S.Ct. 1289, 94 L.Ed.2d 146 (1987). If the target of unlawful command influence is a court member or the military judge, then it violates the accused's right to an impartial forum. *Id.* If unlawful command influence is directed at prospective witnesses to intimidate them from testifying, it violates an accused's right to have access to favorable evidence in violation of the Sixth Amendment and Article 46, UCMJ, 10 USC § 846. 22 MJ at 393. "[W]here unlawful command influence has been exercised," we may not "affirm findings and sentence unless" we are satisfied "beyond a reasonable doubt that the findings and sentence have not been affected" thereby. *Id.* at 394. We review issues involving unlawful command influence *de novo. United States v. Argo,* 46 MJ 454, 457 (1997).

 Where, as in this case, trial is by military judge alone, we have no reason to believe that the military judge would be affected by unlawful command influence, unless there is evidence to the contrary. Furthermore, absent evidence to the contrary, we will not assume that an accused requested a bench trial because of doubts about the impartiality of the court members. *Thomas,* 22 MJ at 396.

 Applying the foregoing principles, we are satisfied beyond a reasonable doubt that appellant's court-martial was not tainted by unlawful command influence. The findings and sentence were determined by a military judge, who was not a member of the local command, and there is no evidence that the military judge was influenced by the actions of MG Keane or CPT Gillroy. Furthermore, as a result of the prompt corrective actions taken by the Government, as well as the exhaustive factfinding hearings and comprehensive judicial orders initiated by the military judge in this case, we are satisfied that appellant was not deprived of any witnesses on the merits or on sentencing. *See United States v. Sullivan,* 26 MJ 442 (CMA 1988). The military judge is the last sentinel protecting an accused from unlawful command influence. In this case, the military judge performed his duty admirably. His aggressive and comprehensive actions ensured that any effects of unlawful command influence were purged and that appellant's court-martial was untainted.

*ISSUE IV: RECUSAL OF MILITARY JUDGE*

*Facts*

At the beginning of the court-martial, the military judge *sua sponte* disclosed that he had presided over a companion case to appellant's and had ruled on an issue of unlawful command influence similar to the issue in appellant's case. At the military judge's invitation, defense counsel conducted an extensive *voir dire* of the military judge regarding his actions in the companion case. Defense counsel then requested the military judge to recuse himself, but the military judge denied the request on the ground that he was impartial and that all information concerning the unlawful command influence was gained in his judicial capacity.

After the military judge had ruled on the defense motions, including the motion to dismiss because of unlawful command influence, the military judge advised appellant of his forum options. Appellant requested trial by military judge alone.

During the testimony of a defense alibi witness, the military judge inquired about the availability of the first sergeant to testify about the reason that the defense alibi witnesses were advised of their Article 31(b) rights and questioned. Trial counsel told the military judge that, "[t]he government feels compelled, at this point, to put some of this stuff into context...." Trial counsel then disclosed that, after the defense requested production of the alibi witness, appellant offered to plead guilty. *See* 49 MJ at 441–42. No evidence or admissions from appellant associated with the offer to plead guilty were disclosed.

The defense moved for a mistrial and requested the military judge to recuse himself. The military judge denied the motion for a mistrial. Before ruling on the recusal motion, he allowed defense counsel to voir dire him extensively. He then denied the motion to recuse himself. The military judge did not conduct further inquiry into the potential inconsistency between appellant's alibi defense and his offer to plead guilty until after findings and sentence were announced.

## Discussion

Appellant now contends that the military judge abused his discretion by refusing to recuse himself. Appellant argues that recusal was required on two grounds: the military judge's involvement in the issue of unlawful command influence in a companion case, and the military judge's exposure to the fact that before trial appellant had offered to plead guilty.

RCM 902(a) requires a military judge to "disqualify himself or herself in any proceeding in which that military judge's impartiality might reasonably be questioned." RCM 902(b)(1) requires recusal "[w]here the military judge has personal bias or prejudice concerning a party or personal knowledge of disputed evidentiary facts concerning the proceeding." RCM 902 is based on 28 USC § 455. See Drafter's Analysis of RCM 902, Manual for Courts-Martial, United States (1995 ed.) at A21–49.

■■■■ The standard of review is abuse of discretion. *United States v. Cornett,* 47 MJ 128, 131 (1997), citing *United States v. Elzy,* 25 MJ 416, 417 (CMA 1988). A request for a bench trial does not necessarily waive a challenge for cause. *Cornett,* 47 MJ at 131. In *United States v. Campos,* 42 MJ 253, 262 (1995), we held:

Where the military judge makes full disclosure on the record and affirmatively disclaims any impact on him, where the defense has full opportunity to voir dire the military judge and to present evidence on the question, and where such record demonstrates that appellant obviously was not prejudiced by the military judge's not re-

cusing himself, the concerns of RCM 902(a) are fully met.

■■■■ Exposure to knowledge that a guilty plea has been offered is not necessarily disqualifying. *United States v. Winter,* 35 MJ 93 (CMA 1992); *United States v. Hodges,* 22 USCMA 506, 47 CMR 923 (1973). Prior judicial involvement in a case is not necessarily disqualifying. *United States v. Soriano,* 20 MJ 337, 340 (CMA 1985).

■■■■ Applying the foregoing principles, we hold that the military judge did not abuse his discretion in this case. At the outset, we note that the military judge ruled in appellant's favor on the issue of unlawful command influence, and he ordered detailed and case-specific remedies to ensure that appellant's trial was untainted by unlawful command influence. On his own initiative, he convened a post-trial hearing to determine whether defense witnesses had been subjected to threats or coercion by the prosecution or members of the command. No incriminating evidence or admissions from appellant related to his offer to plead guilty were disclosed during the trial on the merits. Throughout the trial, the military judge took extraordinary measures to ensure a fair trial. The military judge deferred full inquiry into the circumstances of appellant's offer to plead guilty until after findings and sentence were announced. Our review of the entire record convinces us that the military judge's judicial involvement in a companion case and his minimal exposure to appellant's offer to plead guilty did not affect his impartiality or raise any reasonable doubts about the fairness of appellant's trial.

## ISSUE V: DEFENSE REQUEST FOR AN EXPERT WITNESS

### Facts

Before trial, defense counsel requested that the convening authority authorize the employment of an expert witness on eyewitness identification. The convening authority denied the request. At trial, defense counsel renewed his request before the military judge. The defense theory was that there

were only two witnesses who could identify appellant as the perpetrator, and that one witness, the informant, was lying and the other, Military Police Investigator (MPI) Miller, was mistaken. The defense argued that MPI Miller was an inexperienced investigator conducting his first "controlled buy" of illegal drugs, that MPI Miller was nervous and under stress, and that MPI Miller was Caucasian and appellant was black, raising a question of the reliability of Miller's cross-racial identification of appellant.

The defense proffered that the expert witness would identify several factors affecting the reliability of MPI Miller's identification of appellant: (1) detail salience—the tendency to focus on unusual things, e.g., drugs, instead of commonplace things such as people's faces; (2) stress—the tendency of stress to degrade performance; (3) cross-racial identification—the difficulty experienced by Caucasians in identifying African–Americans; (4) expectancy and set—the tendency to see what a person expects to see; (5) unconscious transference—confusion of information acquired before or after an event with information acquired during the event; and (6) other factors unspecified by defense counsel or the expert witness. The Government opposed the request on the ground that the expert witness would invade the province of the factfinder and confuse the issues by injecting a scientific aura into "common sense issues of fact."

The military judge denied the defense motion, even though the military judge ruled that the requested witness was a properly qualified expert, that the subject matter of the testimony was a proper subject of expert testimony, and that the expert's conclusions "are of the type that would be reasonably relied upon by an expert in his field." The military judge's basis for denying the defense request was that the probative value of the expert testimony was substantially outweighed by the danger of confusing the issues, misleading the court members, or wasting time. The military judge explained:

> I find that the expert's opinion would not appreciably assist the factfinders in understanding the evidence on this issue. I think the conclusions the expert witness

would draw here are, at best, general as they relate to the witness, Miller's expected testimony. I find that they are, essentially, commonplace [and] the subject of fair comment or observation in argument, in cross-examination, and I would further note that, of all the potential juries in the world to consider such issues, professional soldiers are, in fact, likely to understand the potential for inaccurate perception, and recognition, and recall under stress. The catch phrase "the fog of war" is a constant reminder that, under the near ultimate stressful circumstances, information and reports, perceptions, memory and the accuracy of those things can become early casualties.

> I would note, likewise, that it's a fairly common experience among mature, experienced adults that, at some time, we've been profoundly certain about some matter only to learn later that, unbeknownst to us at the time, we were profoundly mistaken as well.

> Finally, the proffered testimony of Doctor Fulero would open the door to a competition of expert opinions on the basic question, that is, should the testimony of Miller be believed, and that's more properly, as the trial counsel argued, the role for cross-examination and argument. And as to the cross-racial identification issue, in particular, and the issue of credibility, generally, that will be the subject of instructions by the court which puts the matter squarely before the court members.

The question of proper instructions was, of course, never reached, because after all motions were decided appellant requested trial by military judge alone.

The informant, EW, testified that he made a controlled buy of cocaine from appellant at appellant's home on September 10, 1993, while MPI Miller waited outside in EW's truck. EW also testified that on September 13, 1993, both he and MPI Miller went into appellant's home and Miller purchased cocaine from appellant.

MPI Miller testified that he was present on September 10, 1993, when EW made a

controlled buy of cocaine, but he did not see appellant on that day. Miller also testified that on September 13, 1993, he made a controlled buy of cocaine from appellant at appellant's home. He described the drug transaction in detail, including a description of appellant's clothing at the time and the brown paper bag in which the cocaine was stored. He testified that he and EW tried unsuccessfully to negotiate a lower price for the "eight ball" of cocaine. He testified that appellant was curious about their ability to dispose of a previous "eight ball" purchase in only three days. Appellant asked them where their "hot spot" was, and they responded that they could not disclose it. Miller testified that, after this discussion, they gave appellant $600.00, and appellant gave Miller the drugs. He testified that appellant asked them if they needed some baggies to package the cocaine, and Miller said, "Yeah, I'll take them." He testified that appellant asked if they cut up the cocaine into $50.00 rocks, and Miller responded, "Yeah." Lastly, Miller testified that he told appellant they would like to get some more cocaine because they hadn't received the amount they expected on the previous buy. Appellant told them "that shouldn't be a problem." Miller testified that at that point they shook hands and departed.

### Discussion

RCM 703(d) provides that a request for employment of an expert witness that is "denied by the convening authority may be renewed before the military judge who shall determine whether the testimony of the expert is relevant and necessary." In deciding that the expert's testimony was not "relevant and necessary," the military judge used the criteria for determining whether the testimony would be admissible. He relied on the factors outlined by the Army Court of Military Review (see 41 MJ 213, 229 n. * (1994)) in *United States v. Hicks*, 7 MJ 561, 563 (citing *United States v. Amaral*, 488 F.2d 1148 (9th Cir.1973): (1) a qualified expert; (2) a proper subject of expert testimony; (3) a "generally accepted" theory; and (4) probative value compared to prejudicial impact), *pet.* in *Hicks denied*, 7 MJ 561 (1979). Our

Court adopted a similar approach in *United States v. Houser*, 36 MJ 392, 397 (1993), setting out six criteria: (1) a qualified expert; (2) proper subject matter; (3) "the basis for the expert testimony"; (4) relevance; (5) "reliability of the evidence"; and (6) "whether the 'probative value' ... outweighs other considerations" under Mil.R.Evid. 403. In this case, the only disagreement is about the sixth *Houser* factor.

We review a military judge's ruling admitting or excluding expert testimony for abuse of discretion. *General Electric Co. v. Joiner*, 522 U.S. 136, 118 S.Ct. 512, 517, 139 L.Ed.2d 508 (1997); *United States v. Sullivan*, 42 MJ 360, 363 (1995). Most courts recognize that the ultimate determination as to admissibility of expert testimony "rests within the sound discretion" of the trial judge. *See United States v. Harris*, 995 F.2d 532, 534 (4th Cir.1993), and cases cited therein. Accordingly, we will not reverse a military judge's decision unless it is "manifestly erroneous." *See General Electric Co. v. Joiner, supra.*

Until recently, most federal courts excluded expert testimony on the validity of eyewitness identification. *See United States v. Harris, supra.* Some federal circuits have retained the *per se* bar against such expert testimony. *See United States v. Smith*, 122 F.3d 1355 (11th Cir.1997). Several circuits, however, allow such testimony under narrow circumstances. *See United States v. Brien*, 59 F.3d 274, 277 (1st Cir.1995) ("We are unwilling to adopt a blanket rule that qualified expert testimony on eyewitness identification must routinely be admitted or excluded."); *United States v. Harris, supra* (recognized such evidence admissible under "narrow" circumstances); *Moore v. Tate*, 882 F.2d 1107, 1110 (6th Cir.1989) (such evidence "admissible in some circumstances"); *United States v. Downing*, 753 F.2d 1224, 1231 (3d Cir.1985) ("under certain circumstances" evidence on eyewitness reliability "may meet the helpfulness requirement" of Fed.R.Evid. 702); *see also United States v. Blade*, 811 F.2d 461, 465 (8th Cir.1987) (noted trend toward balancing "possible helpfulness" against prejudicial impact). Some cir-

cuits have suggested that a comprehensive instruction on the factors affecting reliability of eyewitness identification might be appropriate in lieu of expert testimony. *See United States v. Smith*, 122 F.3d at 1359; *United States v. Rincon*, 28 F.3d 921, 925 (9th Cir.1994); *United States v. Brien*, *supra*.

 We need not decide whether the military judge abused his discretion in this case because we are satisfied that any error in denying the defense motion was harmless beyond reasonable doubt. In his ruling on the defense motion, the military judge, who ultimately became the factfinder pursuant to appellant's request for a bench trial, clearly articulated his understanding of the counterintuitive factors involved in eyewitness identification. Even if the expert might have been helpful to some lay court members, the expert would not have been helpful to the military judge in evaluating the accuracy of Miller's identification of appellant.[3]

Furthermore, MPI Miller was not the sole eyewitness. Appellant was identified by both Miller and EW, the informant. MPI Miller unequivocally and positively identified appellant as the person who sold him cocaine on September 13, 1993. Miller's identification was not based on a fleeting glance, but was the result of spending considerable time with him in negotiations about the price of the cocaine, as well as discussion of packaging, "hot spots" for selling cocaine, and future purchases.

Finally, there is no defense assertion and no evidence that appellant's request for a bench trial was in any way influenced by the military judge's denial of the request for an expert witness.

### Decision

The decision of the United States Army Court of Criminal Appeals is affirmed.

Chief Judge COX and Judges SULLIVAN, CRAWFORD, and EFFRON concur.

---

3. This case is distinguishable on at least two grounds from *United States v. Conley*, 4 MJ 327 (1978), where this Court held that the military judge should have sustained a challenge against himself on the ground that he injected his own expertise as a certified handwriting examiner into his evaluation of the evidence. First, the military judge in this case was not challenged on this ground. Second, the military judge in this case did not rely on specialized knowledge or training, but only on experience common to any relatively experienced military judge.