# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 39214**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Jonathan A. HULL, Jr.**
Technical Sergeant (E-6), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 14 August 2018

————————————

*Military Judge:* Brendon K. Tukey.

*Approved sentence:* Dishonorable discharge, confinement for 1 year and 6 months, and reduction to the grade of E-1. Sentence adjudged 15 July 2016 by GCM convened at Sheppard Air Force Base, Texas.

*For Appellant:* Major Allen S. Abrams, USAF.

*For Appellee:* Lieutenant Colonel Joseph J. Kubler, USAF; Major Tyler B. Musselman, USAF; Captain Michael T. Bunnell, USAF; Mary Ellen Payne, Esquire.

Before JOHNSON, DENNIS, and LEWIS, *Appellate Military Judges*.

Judge DENNIS delivered the opinion of the court, in which Senior Judge JOHNSON and Judge LEWIS joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.**

————————————

DENNIS, Judge:

Appellant, contrary to his pleas, was convicted of one specification of attempt to commit a lewd act upon a minor in violation of Article 80, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 880. Consistent with his pleas,

Appellant was also convicted of one specification of negligent dereliction of duty for failing to register a firearm in violation of Article 92, UCMJ, 10 U.S.C. § 892.[1] Officer and enlisted members sentenced Appellant to a dishonorable discharge, confinement for one year and six months, total forfeiture of pay and allowances, and reduction to the grade of E-1. The convening authority disapproved the adjudged total forfeitures, deferred the mandatory forfeitures until action, and waived the mandatory forfeitures for the benefit of Appellant's spouse. He otherwise approved the sentence as adjudged.

Appellant raises the following issues on appeal: (a) whether the military judge abused his discretion when he precluded the Defense's expert in psychology and human sexuality from testifying; (b) whether the post-trial confinement conditions, disparate treatment because of Appellant's military status, deprivation of healthcare, and failure to pay deferred forfeitures constitute legal error and merit relief; (c) whether the violation of the 120-day post-trial processing standard from sentence to action warrants relief; (d) whether this court's order preventing appellate defense counsel from disclosing the contents of sealed materials to Appellant interfered with Appellant's Sixth Amendment[2] right to participate in his defense; and (e) whether an appellate exhibit missing from the record renders the record incomplete when the military judge relied on it to rule on a motion to compel discovery. Finding no error materially prejudicial to Appellant's substantial rights, we affirm the findings and sentence.

## I. BACKGROUND

While on temporary duty at Keesler Air Force Base, Mississippi, in late November 2015, Appellant responded to a personal advertisement he discovered while searching the "Casual Encounters" section of Craigslist.[3] The advertisement, entitled "Young and Inexperienced ;-) W4M,"[4] read, "Looking for an Air Force guy here at Keesler to teach me stuff. Inexperienced and looking to make this happen soon. Let's chat and see where this goes. Maybe we can swap pics before we go too far :-)."[5] In response, another user posted an advertisement entitled "Re: Young and Inexperienced beware jailbait – w4m" which warned other users "You will go to jail if you mess with her." The "Young and

---

[1] Appellant was acquitted of one specification of attempt to commit a sexual act upon a minor in violation of Article 80, UCMJ.

[2] U.S. CONST. amend. VI.

[3] Craigslist is a website that hosts classified advertisements and discussion forums.

[4] "W4M" is an acronym meaning a woman looking for a man.

[5] Craigslist posts and other social media exchanges in this opinion are quoted without corrections to grammar or spelling.

Inexperienced ;-) W4M" advertisement was flagged for indecency and removed approximately 40 minutes after it was posted.

A few days later, on 3 December 2015, Appellant discovered and responded to another Craigslist advertisement entitled "Young and Restless" that read, "im young and lookin for an airforce guy who can keep a secret;) hit me up and see where it goes." Using the Craigslist automated email feature, Appellant began a conversation with an individual who soon identified herself as a 14-year-old dependent named "Kylie." Unbeknownst to Appellant, "Kylie" was in fact two undercover agents employed by the Air Force Office of Special Investigations (AFOSI) who served as liaisons with the Internet Crimes Against Children (ICAC) Task Force.

Appellant's communications to "Kylie" continued intermittently over the next two days and included a variety of sexual language and pictures. During this period, Appellant shared with "Kylie"—in graphic detail—how to perform oral sex on him and how he would do the same for her. The two eventually arranged for Appellant to meet "Kylie" at her purported on-base home. Appellant arrived as planned, knocked on the door, and was immediately apprehended by law enforcement.

## II. DISCUSSION

### A. Expert Testimony on Psychology and Human Sexuality

Appellant's defense focused on his belief that "Kylie" was an adult pretending to be a 14-year-old girl on Craigslist. In support of this defense, trial defense counsel attempted to call an expert in "psychology of technology and human sexuality." The military judge precluded the testimony. Appellant now asserts that in doing so, the military judge abused his discretion. Appellant's claim gives rise to two questions: (1) Was the proffered expert testimony relevant; and (2) Was Appellant prejudiced by the military judge's exclusion of the testimony? We answer each of these questions in the negative.

#### 1. Additional Facts

Appellant's communications with "Kylie" spanned 39 pages in the record of trial. Soon after "Kylie" described herself as 14 years old but "very mature," she asked Appellant for his picture. He declined saying, "if I send you a pic how do I know ur not a group of cops on a sting mission." "Kylie" then sent a picture of a 15-year-old girl, and Appellant responded, "you are very pretty, can u get out tonite." Throughout the course of their conversation, Appellant repeatedly asked "Kylie" to delete messages and expressed his concern about getting in trouble because she was "so young." Appellant also asked if she was a virgin.

Appellant testified in his own defense at trial. Appellant did not dispute that he sent lewd messages to "Kylie." Rather, he claimed that he believed "Kylie" was an adult woman engaging in a fantasy. Appellant's own words best summarize his testimony:

> At no point in time did I actually think that she was 14. I mean, there was no indication that that was her actual age. And, you know, I'm thinking this grown woman has got, you know, some kind of weird fantasy or some kind of weird fetish, but maybe she's actually normal and we'll see where it goes.

When Appellant was cross-examined by trial counsel, he acknowledged that if "Kylie" was in fact 14 years old, his communications to her would have constituted a lewd act. He further testified that he "didn't expect a 14-year-old to show up, but that doesn't mean that one couldn't show up."

Following Appellant's testimony, trial defense counsel indicated that they were calling their appointed confidential consultant in the psychology of technology and human sexuality, Dr. MD, as a witness. Dr. MD's proffered testimony would cover three areas: (1) general education that there is deception on the Internet and that people engage in fantasies online; (2) studies that indicate the percentage of individuals who believe that others lie online; and (3) the ability of people to accurately estimate age by viewing a picture. Trial counsel objected to the testimony after which the military judge held an extensive hearing outside the presence of the members.

During the hearing, Dr. MD testified regarding her extensive research into online deception. She also testified regarding a research study she conducted into whether an individual would believe that a 14-year-old girl would be in fact communicating on Craigslist. Of the 272 individuals who participated in the study, only three percent believed that an actual 14-year-old girl communicating on Craigslist was a likely or very likely scenario. When trial counsel asked how Dr. MD's research applied to Appellant's case, she responded:

> [I]t's giving a context for the members to understand that this is a believable scenario, that people -- I think for people who aren't familiar with online context, they may believe that that's not true, of course, you might believe everyone, maybe this is what they're thinking, but this is research that shows that -- you know, I've asked 272 people across the United States from all different backgrounds and they're all saying the same thing. So it gives them a context to interpret what they've heard here.

The military judge later had the following exchange with Dr. MD:

Q. Doctor, it seems like the operative question ultimately the members are going to have to do [sic] is they're going to have

4

assess what the accused had to say on the stand and determine whether or not they believe he's telling the truth. Is there anything about your research about the prevalence of lying online that will actually assist the members in determining if the accused is actually being truthful in this specific occasion about this this [sic] specific scenario?

A. I believe that the research gives a context for how often people are truthful and believe others are truthful within sexual environments. So they may then believe that this is relevant to this case as --

Q. Right. But I mean, my question is more specific about that; right?

A. Okay.

Q. Knowing that . . . people lie on the Internet and that sometimes people don't believe what they're told on the Internet, how does that actually help the members assess this specific person and the specific claim he's making that he did not believe what he was told on the Internet? . . .

A. That would have to be based on their judgment, but I think it lends to the veracity of his statements, which have been challenged consistently in this courtroom.

Q. Basically, if I understand what you're saying, it will help the members -- the members can look at the overwhelming number of people who would find that representation to be very unlikely or unlikely [sic] and conclude that it's more likely that he's being honest in his representation?

A. That's correct. That [h]is testimony may have some truth to it.

The military judge sustained trial counsel's objection and excluded the testimony in its entirety. When ruling on the portion of Dr. MD's testimony described as "general education testimony," the military judge articulated his analysis on the record:

[T]he members have already all made it clear that they believe that, in fact, people do commonly deceive and lie on the Internet through voir dire, and that they were all open to the possibility that the accused didn't believe that the person who he was interacting with was, in fact, a 14-year-old girl.

And so I don't see how the general education testimony is going to be helpful to the trier of fact, because it's merely going to tell them that which they are [sic] already know and are open to, which is that people lie on the Internet.

**2. Law and Analysis**

Military judges serve as gatekeepers "tasked with ensuring that an expert's testimony both rests on a reliable foundation and is relevant." Mil. R. Evid. 702; *United States v. Sanchez*, 65 M.J. 145, 149 (C.A.A.F. 2007). We conduct a de novo review of whether the military judge followed the proper framework in accordance with *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). *See United States v. Flesher*, 73 M.J. 303, 311 (C.A.A.F. 2014). If so, we review a military judge's decision to admit expert testimony for an abuse of discretion. *United States v. Billings,* 61 M.J. 163, 166–67 (C.A.A.F. 2005) (citing *United States v. Griffin*, 50 M.J. 278, 284 (1999)). The admission of expert testimony requires the proponent to establish each of the following six factors under the Military Rules of Evidence: (1) the qualifications of the expert; (2) the subject matter of the expert testimony; (3) the basis for the expert testimony; (4) the legal relevance of the evidence; (5) the reliability of the evidence; and (6) whether the probative value of the testimony outweighs other considerations. *United States v. Houser*, 36 M.J. 392, 397 (C.M.A. 1993) (citations omitted); Mil. R. Evid. 401–03, 701–03. "[W]hether admitting or excluding evidence, the standard is whether there is an abuse of discretion such that 'the ruling is manifestly erroneous.'" *United States v. Thomas*, 49 M.J. 200, 202 (C.A.A.F. 1998) (quoting *General Electric Company v. Joiner*, 522 U.S. 136 (1997)).

The "gatekeeping inquiry must be tied to the facts of a particular case." *Sanchez*, 65 M.J. at 149 (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999)). In this case, Appellant neither raises the issue of whether the expert would have survived a *Daubert* challenge nor challenges the military judge's exclusion of studies that indicate the percentage of individuals who believe that others lie online or the ability of people to accurately estimate age by viewing a picture. Rather, Appellant focuses his assignment of error as follows:

The military judge's wholesale exclusion of Dr. MD's testimony was an abuse of discretion because he erroneously determined that the proffered general education testimony was irrelevant. The military judge's error was grounded in treating what the members said in *voir dire* about lying on the Internet as if it was evidence. But *voir dire* is not evidence.

As a general proposition, we agree with Appellant that "*voir dire* is not evidence." But we need not decide whether the military judge was using the member responses as evidence or, if so, whether such consideration was appropriate. We instead focus our analysis on whether the expert testimony was relevant. In doing so, we look only to the fourth *Houser* factor—the legal relevance of the testimony.[6]

### a. Was Dr. MD's testimony legally relevant?

Appellant points to five ways in which Dr. MD's testimony would have been helpful to the members: (1) dishonesty online is more common concerning appearance and age rather than gender; (2) low credibility is placed on what users post on sites like Craigslist; (3) there are common reasons why people lie online; (4) deception online is considered fantasy; and (5) people engage in deception online because "the Internet disinhibits them." We do not doubt that these are the areas Dr. MD's testimony would have covered. The problem arises because each aspect of Dr. MD's proffered testimony shared a common impermissible purpose—to give context for the members to understand that Appellant's purported belief that "Kylie" was an adult engaging in a fantasy was "a believable scenario." We agree with the military judge that such testimony was not relevant.

Though logical relevance is a low threshold, it at a minimum requires the moving party to establish what fact of consequence is made more or less probable by the proffered evidence. Mil. R. Evid. 401, 402. Legal relevance requires the additional step of determining admissibility under Mil. R. Evid. 403. *See United States v. Dimberio*, 56 M.J. 20, 24 (C.A.A.F. 2001) ("[E]ven though the evidence is logically relevant, it may be excluded as not legally relevant if 'its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the members, or by considerations of undue delay….'").

In this case, Dr. MD's responses to both the military judge and trial counsel indicated that the fact of consequence made more or less probable by her testimony was whether Appellant's defense was "believable." But Dr. MD was not comparing Appellant's patterns of behavior to patterns identified in her research. *See United States v. Harrison*, 31 M.J. 330, 332 (C.M.A. 1990) (holding that experts may discuss various patterns of consistency in the stories of child sexual abuse victims and compare those patterns with patterns in the victim's story). Rather, she was testifying to the belief patterns of her research participants in an effort to "lend[ ] to the veracity" of Appellant's testimony. The five

---

[6] Because we find that Appellant fails to establish the legal relevance of the expert testimony, we do not address the remaining *Houser* factors.

ways in which Appellant asserts Dr. MD's testimony would have been helpful are "the functional equivalent of vouching for the credibility or truthfulness" of Appellant. *United States v. Brooks*, 64 M.J. 325, 326–27 (C.A.A.F. 2007). Such testimony is not permitted. *Id.* As noted by the military judge, none of the proffered testimony "actually gives the members any tools that are permissible under the law for evaluating the credibility of the accused's testimony to the effect that he did not believe that the person who was portraying themselves as a 14-year-old girl was a 14-year-old girl." Though this part of the military judge's ruling was related to a different aspect of Dr. MD's testimony, we find it applicable to Dr. MD's general education testimony as well. To the extent the testimony had any probative value, its value was substantially outweighed by the extent to which it would have confused and misled the members. Mil. R. Evid. 403. Put another way, Appellant failed to establish the legal relevance of Dr. MD's testimony.

### b. Was Appellant prejudiced by the military judge's exclusion of Dr. MD's testimony?

We do not take lightly the decision to exclude a defense expert's testimony in its entirety. But we note that even if the military judge's exclusion of Dr. MD's testimony was erroneous, Appellant is not entitled to relief unless we find prejudice. Article 59(a), UCMJ, 10 U.S.C. § 859(a); *United States v. Weeks*, 20 M.J. 22, 25 (C.M.A. 1985) (citations omitted). We find none. In assessing prejudice from excluded expert testimony, we have identified the two important questions to answer: "(1) Was appellant able to adequately present the issue to the members in some other suitable form; and (2) Was the Government's case strong and conclusive when weighed against the defense theory of the case?" *United States v. Garcia*, 40 M.J. 533, 538 (A.F. Ct. Crim. App. 1994) (citing *Weeks*, 20 M.J. at 25), *aff'd*, 44 M.J. 27, 30 (C.A.A.F. 1996)). We affirmatively answer both questions.

First, evidence that people lie online was repeatedly provided to the members. In addition to Appellant's testimony about his extensive online fantasy experience, one of the AFOSI agents twice conceded to trial defense counsel that people cannot be trusted online. Second, Appellant's theory of the case was weakened by his own words. When cross-examined by trial counsel, Appellant offered no explanation for why he continued to ask if "Kylie" was "a cop" if he believed she was an adult engaging in a fantasy. In the 39 pages of messages Appellant exchanged with "Kylie," he identified only three factors causing him to believe "Kylie" was an adult. The first was "Kylie's" message that she was "a lil young, but mature for my age :)." The second was "Kylie's" comment that she liked "guys in uniform ;)." The third was "Kylie's" message "I take care of myself" in response to Appellant's question about whether she

had hair on her "p***y." Perhaps most consequential was Appellant's explanation for how he could reasonably believe that "Kylie" was an adult while assuming she could not purchase her own alcohol. His proffered reason—that her husband did not allow such purchases and may have looked at her credit cards—defied common sense. By comparison, the Government's evidence of Appellant's extensive conversations with "Kylie" and his responding to a similar Craigslist advertisement entitled "Young and Inexperienced" after having been warned that the person who posted it was a minor, weighed heavily against the defense theory of the case that Appellant believed "Kylie" to be "a grown woman." In the absence of prejudice, Appellant is not entitled to relief.

## B. Confinement Conditions and Post-Trial Maltreatment

Appellant next asserts that he was subjected to illegal post-trial confinement conditions; was subjected to disparate treatment because of his military status; was deprived of healthcare because the Government failed to place him in excess leave status; and was deprived of payment owed him following his court-martial. Appellant argues that these errors constitute legal error and warrant relief. We disagree. We also decline Appellant's invitation to grant him relief using our power under Article 66(c), UCMJ, 10 U.S.C. § 866(c).

### 1. Confinement Conditions[7]

Appellant asserts that his confinement conditions constituted cruel and unusual punishment. We disagree.

#### a. Additional Facts

Appellant began his sentence to confinement at Wichita County (Texas) Detention Center. Appellant was initially placed in solitary confinement but was transferred to general population at his request. According to a declaration from the assistant jail administrator at the detention center, Appellant's placement in solitary confinement was "required by the contract between Wichita County and Sheppard Air Force Base." The Memorandum of Agreement between Sheppard Air Force Base (AFB) and Wichita County states that "[i]f space is available the detainee/inmate shall be segregated IAW Article 12[,] UCMJ . . . ." Appellant remained in solitary confinement for approximately 12 hours.

Appellant's stay at the Wichita County Detention Center lasted approximately 80 days, significantly longer than the typical one- to two-week period before military members are transferred to a military confinement facility.

---

[7] Both parties successfully moved this court to attach declarations outlining the conditions of Appellant's confinement and the facts giving rise to this alleged error.

This was apparently due to a dispute over which organization was responsible for funding Appellant's transfer.

The jail annex where Appellant was located contained open barred housing tanks with concrete floors and cinderblock walls. The cells included an open toilet and shower. Appellant, himself a retired prison guard, described the sanitation conditions as terrible in his clemency submission to the convening authority. Appellant also asserts that when he was being threatened by other inmates in his cell, it took guards three to four hours to relocate him to a different cell.

Appellant eventually became ill and requested medical treatment for a variety of ailments including a chronic ear condition, anxiety, psoriasis, and an issue he was having with his retainer. Appellant was seen by medical personnel at least three times during his confinement at the detention center. Approximately 45 days after his initial request, Appellant was provided with medicated ear drops and antibiotics to treat his ear condition. Appellant did not receive treatment for his psoriasis until he was transferred to military confinement.

### b. Law and Analysis

Both the Eighth Amendment to the United States Constitution[8] and Article 55, UCMJ, 10 U.S.C. § 855, prohibit cruel and unusual punishment. In general, we apply the Supreme Court's interpretation of the Eighth Amendment to claims raised under Article 55, UCMJ, except where legislative intent to provide greater protections under Article 55, UCMJ, is apparent. *United States v. Avila*, 53 M.J. 99, 101 (C.A.A.F. 2000) (citing *United States v. Wappler*, 9 C.M.R. 23, 26 (C.M.A. 1953)).

"[T]he Eighth Amendment prohibits two types of punishments: (1) those 'incompatible with the evolving standards of decency that mark the progress of a maturing society' or (2) those 'which involve the unnecessary and wanton infliction of pain.'" *United States v. Lovett*, 63 M.J. 211, 215 (C.A.A.F. 2006) (quoting *Estelle v. Gamble*, 429 U.S. 97, 102–03 (1976)). We apply the three-part test prescribed in *Lovett* to determine whether the conditions of Appellant's confinement violated the Eighth Amendment and thus Article 55, UCMJ. Appellant must show: (1) an objectively, sufficiently serious act or omission resulting in the denial of necessities; (2) a culpable state of mind on the part of prison officials amounting to deliberate indifference to Appellant's health and safety; and (3) that Appellant has exhausted the prisoner-grievance

---

[8] U.S. CONST. amend. VIII.

system and that he has petitioned for relief under Article 138, UCMJ, 10 U.S.C. § 938. *Lovett*, 63 M.J. at 215.

Assuming without deciding that Appellant satisfied the first prong outlined in *Lovett*, his claim fails on both the second and third prongs.

As to the second prong, a culpable state of mind on the part of prison officials, we find no evidence that prison officials acted with deliberate indifference to Appellant's health and safety. On the contrary, the record demonstrates that prison officials acted on Appellant's complaints of being threatened, his objection to solitary confinement, and his medical conditions. When Appellant reported being threatened, he was transferred to a new cell within a few hours. With regard to Appellant's placement in solitary confinement, we note that Appellant was transferred to the general population upon request. Appellant argues that he was subjected to disparate treatment in violation of Article 58, UCMJ, 10 U.S.C. § 858, but he fails to establish any evidence that his placement in solitary confinement was inconsistent with the treatment of civilian inmates. With regard to the treatment of Appellant's medical conditions, Appellant was afforded multiple visits with medical professionals. Though somewhat belatedly, he was also provided medication for his chronic ear condition. We disagree with Appellant's assertion that the Government's failure to timely transfer Appellant to a military confinement facility is evidence of its deliberate indifference to Appellant's medical conditions. Although Appellant stayed at the detention center longer than other post-trial military inmates, we do not find that the length of the stay, even under the conditions Appellant described, was incompatible with the evolving standards of decency or involved the unnecessary and wanton infliction of pain.

As to the third prong, the exhaustion of the prisoner-grievance system, we find that Appellant has failed to satisfy this requirement. Though acknowledging his failure to file a complaint under Article 138, UCMJ, 10 U.S.C. § 938, Appellant asserts that he satisfied "the purpose of the exhaustion requirement" through the multiple complaints he made to Air Force and Wichita County Jail officials. We are not persuaded. The purpose of the requirement to exhaust remedies is two-fold: "(1) the 'resolution of grievances at the lowest possible level' with 'prompt amelioration' of the complaint while the prisoner suffers the condition, and (2) the development of an adequate record to aid in appellate review." *United States v. McPherson*, 73 M.J. 393, 397 (C.A.A.F. 2014) (citing *United States v. Wise*, 64 M.J. 468, 471 (C.A.A.F. 2007)). Appellant's complaints achieved neither. First, despite having touted his personal knowledge of the prison system, Appellant did not use the prisoner grievance process to try to resolve his complaints at the lowest possible level. Rather, he made the allegations in his clemency submission after he had already been transferred to a military confinement facility. Had he filed the grievances while

in the civilian confinement facility, the record would reflect what, if any, action the prison took in response. This brings us to Appellant's failure to exhaust remedies and thereby develop a record. Appellant did not file a single complaint using the prisoner-grievance system, but did use the prison's system for requesting medical care on several occasions. In fact, the record contains detailed accounts of what action prison officials took in response to each request. Unlike his requests for medical care, Appellant failed to make his grievances known to prison officials and thus made it impossible for them to ameliorate, let alone record, those grievances.

Accordingly, we find that Appellant's confinement conditions do not warrant relief under the Eighth Amendment or Articles 55 or 58, UCMJ.

### 2. Pay and Excess Leave Status

Appellant also asserts that the Government's failure to pay Appellant's spouse the deferred forfeitures and its refusal to place Appellant on excess leave constituted legal error warranting relief. We find that Appellant's spouse has been paid the deferred forfeitures owed her in accordance with the convening authority's action. For the reasons outlined below, we find that we lack jurisdiction to decide Appellant's claim regarding excess leave.

#### a. Additional Facts

On 22 August 2016, in a memorandum to Appellant, the convening authority granted Appellant's request to defer mandatory forfeitures from their effective date of 29 July 2016 until the date of action and denied Appellant's request to defer adjudged forfeitures and reduction in rank. This same memorandum also purported to disapprove the adjudged forfeitures, which would render moot the request to defer them.

The convening authority took action on 27 January 2017. He disapproved Appellant's adjudged forfeitures and waived the mandatory forfeitures required by Article 58b, UCMJ, 10 U.S.C. § 858b. He directed that (1) the waiver commence on the date of action; (2) the waiver continue for up to six months or until release from confinement, whichever is sooner; and (3) the waived forfeitures be paid directly to Appellant's spouse. Appellant was released from confinement on 23 April 2017.

Approximately two months after action, Appellant's spouse received a lump sum payment of $18,897.24—approximately six months' worth of pay and allowances. When Appellant's spouse claimed she was owed more, the unit responsible for processing Appellant's pay (911 AW/FM) investigated and made the following findings: (1) because the convening authority disapproved the adjudged forfeitures, Appellant was owed pay for the period between 22 August 2016 and 27 January 2017, the date of action; and (2) because the convening authority waived the mandatory forfeitures only from the date of action until

Appellant's release from confinement, Appellant's spouse was paid more than the approximately three months' worth of pay and allowances to which she was entitled. According to 911 AW/FM's calculations of 9 May 2018, the overpayment to Appellant's spouse of waived forfeitures and the non-payment to Appellant of deferred forfeitures resulted in a net $7,189.02 owed to the "Hull estate."

The convening authority's action also directed that Appellant "take leave pending completion of appellate review," in accordance with Article 76a, UCMJ, 10 U.S.C. § 876a. This period is commonly referred to as "excess leave." For the purpose of disciplinary action, Appellant was involuntarily extended on active duty "as needed" until 15 January 2018.

### b. Law and Analysis

As a threshold matter, we must first determine whether we have jurisdiction. Jurisdiction is a question of law reviewed de novo. *Randolph v. HV*, 76 M.J. 27, 29 (C.A.A.F. 2017) (citations omitted). The party seeking to invoke the court's jurisdiction has the burden to establish it exists. *Id.* at 29 (quoting *United States v. LaBella*, 75 M.J. 52, 53 (C.A.A.F. 2015)).

It is well settled that we have jurisdiction to ensure that Appellant is not subjected to forfeiture of pay and allowances in excess of those permitted by law as a result of his court-martial. *See United States v. Promin*, 54 M.J. 467, 468 (C.A.A.F. 2001) (citing *United States v. Gorski*, 47 M.J. 370 (C.A.A.F. 1997)). We recently drew a distinction between the financial components of an appellant's sentence and matters that "[do] not concern the legality or appropriateness of an approved court-martial sentence." *United States v. Buford*, 77 M.J. 562 (A.F. Ct. Crim. App. 2017), *rev. denied*, 77 M.J. 267 (C.A.A.F. 2018). We have jurisdiction over the former and not the latter. In *Buford*, we held that Article 66(c), UCMJ, does not grant this court jurisdiction over a pay dispute absent a nexus to the approved sentence. *Id.* at 563. We have also expressly rejected jurisdiction over an appellant's claim for back pay. *United States v. Dodge*, 60 M.J. 873, 878 (A.F. Ct. Crim. App. 2005) (citation omitted), *aff'd*, 61 M.J. 288 (C.A.A.F. 2005).

Applying these principles to Appellant's case, we find our jurisdiction clearly extends over whether the deferment of Appellant's forfeitures was properly executed. With equal clarity, we find a lack of jurisdiction over Appellant's excess leave status.

With regard to Appellant's forfeitures, the record before us demonstrates that the convening authority intended to disapprove the adjudged total forfeiture of pay and allowances and waive the mandatory forfeitures for the benefit of Appellant's spouse and their dependent child in accordance with Articles 57

and 58b, UCMJ. We note a litany of errors in the convening authority's response to Appellant's deferment request. In addition to not including the reasons for denying Appellant's request to defer the adjudged reduction in rank, the convening authority's deferment memorandum appears to have prematurely disapproved the adjudged forfeitures. *See* Rule for Courts-Martial (R.C.M.) 1101(c)(3), Discussion; R.C.M. 1107(b)(2). Notwithstanding the errors in the convening authority's memorandum, we find that the convening authority's action is consistent with his intent to (1) disapprove the adjudged forfeitures and (2) waive mandatory forfeitures for the benefit of Appellant's spouse and their dependent child. As a result of the terms of the memorandum and action, we conclude that Appellant is entitled to the deferred mandatory forfeitures of E-1 pay and allowances from 29 July 2016 until the date of action (27 January 2017) and that his spouse is entitled to the waived mandatory forfeitures of E-1 pay and allowances from the date of action until the date Appellant was released from confinement (23 April 2017).

With regard to Appellant's claim that he should have been placed on excess leave and was entitled to certain benefits in that status, we lack jurisdiction. Appellant's claim to excess-leave or any duty status is collateral to his approved sentence. Appellant focuses on how his not being in excess leave status cut off his access to military healthcare, while the appellant in *Buford* focused on the negative impact of his being in excess (vice accrued) leave status on his pay and allowances. Still, we conclude, as we did in *Buford*, that Appellant's leave status does not concern the legality or appropriateness of an approved court-martial sentence and thus we do not have jurisdiction.

### 3. Relief under Article 66(c), UCMJ

Finally, we turn to whether this court should exercise its power under Article 66(c), UCMJ, to grant Appellant's requested relief. Citing *United States v. Gay*, 74 M.J. 736, 742 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), Appellant asks that we grant him two-for-one credit for his post-trial confinement conditions and set aside his dishonorable discharge for the claims relating to his pay and excess leave status. But "[o]nly in very rare circumstances do we anticipate granting sentence relief when there is no violation of the Eighth Amendment or Article 55, UCMJ." *United States v. Ferrando*, 77 M.J. 506, 517 (A.F. Ct. Crim. App. 2017) (citations omitted); *cf. United States v. Nerad*, 69 M.J. 138, 145–47 (C.A.A.F. 2010) (holding that despite our significant discretion in reviewing the appropriateness of a sentence, this court may not engage in acts of clemency). For all the reasons previously stated, we do not find such circumstances present in this case.

**C. Post-Trial Processing Delay**

It took 196 days from the day Appellant was sentenced for the convening authority to take action. Appellant asks this court to set aside his dishonorable discharge based on this presumptively unreasonable delay. We decline to do so.

Where the convening authority's action is not taken within 120 days of the end of trial, we apply the presumption of unreasonable post-trial delay established by the United States Court of Appeals for the Armed Forces (CAAF) in *United States v. Moreno*, 63 M.J. 129, 142 (C.A.A.F. 2006). We review de novo whether Appellant's due process rights were violated because of post-trial delay. *Id.* at 135 (citations omitted). In conducting our analysis, we have considered the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530–32 (1972): (1) the length of the delay; (2) the reasons for the delay; (3) Appellant's assertion of the right to timely review and appeal; and (4) prejudice. "[These] four factors are balanced, with no single factor being required to find that post-trial delay constitutes a due process violation." *Moreno,* 63 M.J. at 136 (citing *Barker*, 407 U.S. at 533). We apply these factors in turn.

The first factor, the length of the delay, weighs in Appellant's favor because the Government exceeded the *Moreno* standard for a presumptively unreasonable delay by 76 days.

The second factor, the reasons for the delay, also weighs in Appellant's favor. Though the Government points to the "proactive steps" it took to process Appellant's case, the reasons for the delay cannot be attributed to Appellant. For instance, significant workload prevented the court reporter from beginning to transcribe the verbatim portion of Appellant's record of trial until 60 days after sentence was announced. Similarly, efforts to locate missing exhibits—after 136 days had already passed—resulted in an additional 30-day delay.

The third factor, whether Appellant exercised his right to speedy appellate review, weighs slightly in Appellant's favor. Appellant submitted a demand for speedy post-trial review, albeit 191 days after the conclusion of his trial.

As to the final factor, prejudice, *Moreno* sets forth three types of prejudice arising from post-trial processing delays. 63 M.J. at 138–39. The first, oppressive incarceration, does not apply to Appellant because he does not prevail in his substantive appeal. *Id.* at 139. The second, anxiety and concern, is likewise inapplicable to Appellant. Appellant avers that the post-trial delay in his case caused anxiety and concern because his case was still pending action less than two weeks before his parole board was scheduled to meet. While this could certainly be cause for concern, it does not rise to the level of "particularized anxiety or concern that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision." *Id.* at 140. The third and final factor,

impairment of the appellant's ability to present a defense at a rehearing, is mooted by Appellant's failure to prevail in his substantive appeal. *Id.* Prejudice, then, weighs in the Government's favor.

Where, as here, there is no discernible prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006). Considering the relevant factors together, we conclude that the 196 days that elapsed between the conclusion of trial and the convening authority's action are not so egregious as to impugn the fairness and integrity of the military justice system.

Recognizing our authority under Article 66(c), UCMJ, we have also considered whether relief for excessive post-trial delay is appropriate in this case even in the absence of a due process violation. *See United States v. Tardif*, 57 M.J. 219, 225 (C.A.A.F. 2002). In *Gay*, we set forth the following factors to determine whether *Tardif* relief was warranted:

> 1. How long did the delay exceed the standards set forth in *United States v. Moreno*, 63 M.J. 129 (C.A.A.F. 2006)?
>
> 2. What reasons, if any, has the government set forth for the delay? Is there any evidence of bad faith or gross indifference to the overall post-trial processing of this case?
>
> 3. Keeping in mind that our goal under *Tardif* is not to analyze for prejudice, is there nonetheless some evidence of harm (either to the appellant or institutionally) caused by the delay?
>
> 4. Has the delay lessened the disciplinary effect of any particular aspect of the sentence, and is relief consistent with the dual goals of justice and good order and discipline?
>
> 5. Is there any evidence of institutional neglect concerning timely post-trial processing, either across the service or at a particular installation?
>
> 6. Given the passage of time, can this court provide meaningful relief in this particular situation?

*Gay,* 74 M.J. at 744.

Appellant points to the fifth factor and asserts that there is an "institutional neglect" at Sheppard AFB, which warrants relief under *Tardif*. Specifically, Appellant points to several cases over the course of the last 15 months in which post-trial delays were at issue. We do note that we have addressed issues regarding presumptively unreasonable post-trial processing delays in at least five cases from Sheppard AFB within the last 15 months, including one case in

which we found that the Government lacked "a sense of urgency." *United States v. Williams*, No. ACM 39050, 2017 CCA LEXIS 415, at *6 (A.F. Ct. Crim. App. 14 Jun. 2017) (unpub. op.).[9] While we find this trend troubling, we do not yet conclude that these issues are the result of "institutional neglect." *Tardif,* 57 M.J. at 225.

After considering the factors enumerated in *Gay*, we conclude that relief is not warranted. On the whole, the processing of Appellant's case has not been subjected to excessive post-trial delay, and we perceive no substantial harm to Appellant, prejudice to the interests of justice or discipline, or erosion of this court's ability to conduct our review or grant appropriate relief that would move us to modify an otherwise fitting sentence.

## D. Denial of Access to Sealed Materials

Appellant next asserts that his appellate counsel's inability to provide him with sealed materials interfered with his Sixth Amendment right to participate in his defense. We find no merit in his assertion.

In deciding a motion to compel discovery filed by trial defense counsel, the military judge reviewed, *in camera*, a variety of materials from the ICAC Task Force and related sting operations conducted by the AFOSI. The military judge found some of the ICAC training program material relevant and released it to the parties. The remaining materials, including the AFOSI Manuals governing these types of operations, were withheld from the parties at trial and ordered sealed by the military judge. Withheld materials were consolidated to constitute Appellate Exhibit XLIV. While Appellant's case was pending appellate review, this court granted a request to allow appellate counsel access to Appellate Exhibit XLIV but directed that counsel "not photocopy, photograph, or otherwise reproduce this material" and "not disclose or make available its contents to any other individual without this court's prior written authorization." Appellant's counsel subsequently requested authorization to disclose to and discuss with Appellant the contents of Appellate Exhibit XLIV. This court denied the request but authorized Appellant's counsel to discuss with Appellant the sealed assignment of error regarding the incomplete record.

R.C.M. 1103A governs the disclosure of sealed materials by reviewing and appellate authorities. Our interpretation of this rule is a question of law we

---

[9] *See also United States v. Swafford*, No. ACM S32416, 2017 CCA LEXIS 681, at *2 (A.F. Ct. Crim. App. 17 Oct. 2017) (unpub. op.); *United States v. Wideman*, No. ACM S32398, 2017 CCA LEXIS 594, at *9 (A.F. Ct. Crim. App. 29 Aug. 2017) (unpub. op.); *United States v. Thomas*, No. ACM 38977, 2017 CCA LEXIS 391, at *10 (A.F. Ct. Crim. App. 6 Jun. 2017) (unpub. op.); and *United States v. Bickham*, No. ACM S32400, 2017 CCA LEXIS 377, at *3 (A.F. Ct. Crim. App. 25 May 2017) (unpub. op.).

review de novo. *See L.R.M. v. Kastenberg*, 72 M.J. 364, 369 (C.A.A.F. 2013) (citations omitted). As a starting point, we note the well-settled principle that judges may place restrictions on sealed matters viewed *in camera*. *See United States v. Rivers*, 49 M.J. 434, 437 (C.A.A.F. 1998) (citing *Pennsylvania v. Ritchie*, 480 U.S. 39, 59 (1987)). In *Ritchie*, the Supreme Court noted that "the eye of an advocate may be helpful to a defendant in ferreting out information." *Ritchie*, 480 U.S. at 59.

Here, this court, after conducting its own *in camera* review, granted appellate counsel access to Appellate Exhibit XLIV but limited any further disclosure. This action is consistent with the requirements set forth in R.C.M. 1103A.[10] Counsel has asserted that Appellant's inability to review the contents of the sealed materials limited Appellant's ability to determine whether to submit matters pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982). We are not persuaded. Appellant, both personally and through counsel, was provided sufficient access to fully exercise his appellate rights, including the right to assert points of error on his own behalf. *Id.* at 436–37.

We therefore find no interference with Appellant's Sixth Amendment right to participate in his own defense.

## E. Incomplete Record[11]

In his final assignment of error, Appellant asserts that training slides missing from Appellate Exhibit XLIV render the record of trial incomplete and asks this court to approve only so much of Appellant's sentence as could be adjudged by a special court-martial. We find the omission insubstantial and decline to grant the requested relief.

As previously discussed, the military judge reviewed a variety of materials contained in Appellate Exhibit XLIV pursuant to a motion to compel discovery filed by trial defense counsel. Among these materials were ICAC Task Force training slides. When arguing a motion during Appellant's trial, trial defense counsel indicated that the slides would assist in Appellant's "ability to confront

---

[10] We note that R.C.M. 1103A was modified by Exec. Order 13825, 83 Fed. Reg. 9889, 9897 (1 Mar. 2018), to require a showing of good cause before appellate counsel are permitted to view matters previously undisclosed to trial counsel or trial defense counsel. R.C.M. 1103A(b)(4)(B)(ii) and 1103A(b)(4)(C)(ii). Both the current and previous version of the rule preclude appellate counsel from disclosing sealed matters without prior authorization from an appropriate approving authority, such as the court.

[11] Appellate Exhibit XLIV and the briefs regarding its missing components were sealed pursuant to R.C.M. 1103A. The exhibit and the briefs remain sealed and any discussion of sealed material in this opinion is limited to that which is necessary for the analysis. *See* R.C.M. 1103A(b)(4).

[the AFOSI agents] about how they were training and were they really follow-ing ICAC guidance." Following arguments of counsel, the military judge ini-tially released two pages from the set of training slides he was provided for *in camera* review. When trial defense counsel later requested he conduct a second review, the military judge released an additional 14 pages of training materi-als, which trial defense counsel used to cross-examine the two AFOSI agents posing as "Kylie." The portion of the released training materials are marked separately, but the portion of the training materials the military judge did not release were to be contained in Appellate Exhibit XLIV. Yet, the unreleased training slides are not included in the record.

In conjunction with the answer to Appellant's assignments of error, the Government moved this court to attach what it proffers are the missing train-ing slides. This court granted the motion.

Whether a record of trial is complete is a question of law we review de novo. *United States v. Henry*, 53 M.J. 108, 110 (C.A.A.F. 2000).

When a sentence includes a punitive discharge, Article 54, UCMJ, 10 U.S.C. § 854, requires the preparation of a complete record of the proceedings. A complete record of proceedings requires, among other things, "[e]xhibits, or, with the permission of the military judge, copies, photographs, or descriptions of any exhibits which were received in evidence and any appellate exhibits." R.C.M. 1103(b)(2)(D)(v). In determining whether a record is complete, "the threshold question is 'whether the omitted material was substantial,' either qualitatively or quantitatively." *United States v. Davenport*, 73 M.J. 373, 377 (C.A.A.F. 2014) (quoting *United States v. Lashley*, 14 M.J. 7, 9 (C.M.A. 1982)) (additional citations and internal quotations omitted). An omission is "quanti-tatively substantial unless 'the totality of omissions . . . becomes so unim-portant and so uninfluential when viewed in the light of the whole record, that it approaches nothingness.'" *Davenport*, 73 M.J. at 377 (quoting *United States v. Nelson*, 13 C.M.R. 38, 43 (C.M.A. 1953)) (alteration in original). An omission is qualitatively substantial "if the substance of the omitted material 'related directly to the sufficiency of the Government's evidence on the merits[.]'" *Dav-enport*, 73 M.J. at 377 (quoting *Lashley*, 14 M.J. at 9).

"The question of what constitutes a substantial omission is conducted on a case-by-case, fact based inquiry." *United States v. Abrams*, 50 M.J. 361, 363 (C.A.A.F. 1999). Failure to comply with R.C.M. 1103(b)(2) "does not necessarily require reversal." *Abrams*, 50 M.J. at 363 (citation omitted). Rather, an incom-plete record "raises a presumption of prejudice which the Government may re-but." *Id.*

Applying these principles to the facts of Appellant's case, we find that the absence of the training slides is not a substantial omission from the record of

trial.[12] We distinguish this case from *Abrams*, in which the military judge conducted an *in camera* review of records pertaining to the prosecution's primary witness against the appellant. The trial defense counsel in the case asserted that there was information in the records that could be used to impeach the witness' credibility. The military judge denied the defense counsel's request but failed to seal or attach the records in question to the record of trial. The CAAF held that the missing records required reversal because its absence made it "impossible" for the appellate court to determine whether the military judge's ruling constituted a violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

Appellant's case differs in two significant ways. First, unlike the military judge in *Abrams*, the military judge in Appellant's case partially granted trial defense counsel's request for the training information by initially providing two training slides and, upon a request for reconsideration, released 14 additional pages of training materials. After the military judge's ruling, trial defense counsel used the training slides to impeach the credibility of the AFOSI agents. Second, the missing material in Appellant's case was not directly related to the sufficiency of the Government's case on the merits and had no bearing on the crux of Appellant's defense that he did not believe "Kylie" was a 14-year-old girl. Appellant attempts to sidestep this distinction by generally asserting prejudice in "stifling [his] ability to seek redress for any error made by the judge" in ruling on the motion to compel discovery. We find no such prejudice. The other matters contained in the record, including other training slides released to trial defense counsel following the military judge's *in camera* review, sufficiently provided Appellant the opportunity to cross-examine the AFOSI agents regarding their participation in the operation involving Appellant.

We do not find the omission in any way limits our ability to conduct a complete review in accordance with Article 66, UCMJ, and therefore grant no relief.

### III. CONCLUSION

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c) UCMJ.

---

[12] The Government attempted to reconstruct the omitted material by attaching declarations from two AFOSI agents that the slides at issue were located and provided to the court. Though laudable, these efforts do not satisfy the requirements of R.C.M. 1104(d), which requires an incomplete record to be returned to the military judge for a certificate of correction in order to make the record complete. We therefore do not consider the matters in our analysis of whether the record was substantially complete.

Accordingly, the findings and the sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court